**Suzanne GENEREUX, et al., Plaintiffs,**

v.

**HARDRIC LABORATORIES, INC., et al., Defendants.**

**Ernest Bettuchy, et al., Plaintiffs,**

v.

**Raytheon Company, Defendant.**

**C.A. Nos. 04–12137, 10–11652.**

United States District Court, D. Massachusetts.

June 23, 2013.

---

330

Ruben Honik, Sherrie J. Cohen, Kevin W. Fay, Golomb & Honik, P.C., Philadel-

phia, PA, Leo V. Boyle, Michael B. Bogdanow, Peter J. Ainsworth, Victoria M. Santoro, Bradley M. Henry, Meehan, Boyle, Black & Bogdanow, P.C., Boston, MA, for Plaintiffs.

Alan M. Spiro, Edwards Wildman Palmer LLP, James F. Kavanaugh, Jr., Ronald M. Jacobs, Conn, Kavanaugh, Rosenthal, Peisch & Ford, LLP, David Yamin, Janice W. Howe, Bingham McCutchen LLP, Boston, MA, Jeffrey D. Ubersax, Timothy M. Hudson, Jones Day, Cleveland, OH, for Defendants.

## MEMORANDUM AND ORDER

WOLF, District Judge.

## I. SUMMARY

Plaintiffs in these consolidated actions are current and former employees of defendant Raytheon Company ("Raytheon"), and members of these employees' households. Plaintiffs seek a program of "medical monitoring" for beryllium-related diseases. The cause of action for medical monitoring was first recognized by the Massachusetts Supreme Judicial Court (the "SJC") in *Donovan v. Philip Morris USA, Inc.*, 455 Mass. 215, 914 N.E.2d 891 (2009) (*"Donovan I "*).

Raytheon has filed a Motion for Summary Judgment, which plaintiffs oppose. The Motion for Summary Judgment contends that plaintiffs would be unable to prove at trial that they have suffered "subcellular change," one of the seven elements of actions seeking medical monitoring delineated by *Donovan I*. A hearing on the Motion for Summary Judgment was held on June 11, 2013.

As explained below, the Motion for Summary Judgment is meritorious. Subcellular change is a necessary element of the claims plaintiffs assert. The record, construed in the light most favorable to plaintiffs, would not permit a reasonable trier of fact to conclude that plaintiffs have proven this element. Rather, the record indicates

only that plaintiffs have suffered an "increased risk" of subcellular change. Consequently, this case presents no genuine dispute of material fact, and Raytheon is entitled to judgment as a matter of law. The court is, therefore, allowing the Motion for Summary Judgment.

## II. PROCEDURAL HISTORY

### A. *Background*

This proceeding involves two cases that have been consolidated for at least pretrial purposes. *Genereux* (C.A. No. 04–12137) was brought by Suzanne Genereux, who is a former Raytheon employee, and her family members, on behalf of themselves alone. *See* 2d Am. Compl. & Jury Claim ¶¶ 1–2, 10–11 ("Genereux Compl."). The named plaintiffs in *Bettuchy* (C.A. No. 10–11652) seek to represent two classes of plaintiffs: (a) individuals who worked at Raytheon's Waltham, Massachusetts plant for at least one month, before December 31, 1996, who have not been diagnosed with Chronic Beryllium Disease ("CBD"); and (b) members of their households. *See* Am. Class Action Compl. ¶ 22 ("Bettuchy Compl.").

Plaintiffs allege that Raytheon handled beryllium negligently at its Waltham facility, exposing the employee plaintiffs and, indirectly, members of their households to elevated levels of beryllium. *See* Bettuchy Compl. ¶¶ 13, 26, 30. Allegedly, plaintiffs' exposure to beryllium increased their risk of suffering from beryllium-related diseases, particularly CBD. *See id.* ¶ 20.

Suzanne Genereux, who has been diagnosed with CBD, brought personal-injury claims against several suppliers who had provided Raytheon with components containing beryllium. The parties settled these claims. Suzanne Genereux's family members seek medical monitoring from Raytheon. Both putative classes in *Bettuchy* seek medical monitoring as well.

Neither the remaining Genereuxs nor the putative *Bettuchy* class members exhibit any symptoms of CBD at present. *See* Genereux Compl. 563; Bettuchy Compl. ¶ 22. Plaintiffs ask that Raytheon be ordered to fund a "medical monitoring program ... including, but not limited to, testing, and preventative screening." Bettuchy Compl. ¶ 53.

The claim for medical monitoring in *Genereux* was initially dismissed for failure to allege damages. *See* May 12, 2005 Order (Tauro, J.), Subsequently, the SJC issued its decision in *Donovan I*. The plaintiffs in that case sought to represent a class of symptom-free cigarette smokers with smoking histories of twenty "pack-years." They asked the court to order medical monitoring. Before deciding whether to certify the class, the judge to whom the case had been reassigned, Judge Nancy Gertner, certified two questions to be answered by the SJC. One of the questions was whether a suit "for medical monitoring, based on ... subclinical effects ... state[s] a cognizable claim and/or permit[s] a remedy under Massachusetts state law." Feb. 23, 2009 Order.

The SJC answered affirmatively. It stated that a cause of action may arise where "competent medical testimony establishes that medical monitoring is necessary to detect the potential onset of a serious illness or disease *due to physiological changes* indicating a substantial increase in risk of harm from exposure to a known hazardous substance." *Donovan I*, 914 N.E.2d at 901 (emphasis added). The SJC held that a plaintiff seeking medical monitoring must prove the following:

(1) The defendant's negligence (2) caused (3) *the plaintiff to become exposed to a hazardous substance that produced, at least, subcellular changes* that substantially increased the risk of serious disease, illness, or injury (4) for which an effective medical test for reli-

able early detection exists, (5) and early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury, and (6) such diagnostic medical examinations are reasonably (and periodically) necessary, conformably with the standard of care, and (7) the present value of the reasonable cost of such tests and care, as of the date of the filing of the complaint.

*Id.* at 901–02 (emphasis added). The decision uses the terms "subcellular change," "subclinical change," and "physiological change" nearly interchangeably. *See id.* at 894 (subclinical); *id.* at 901 (all three terms); *id.* at 902 (subcellular); *id.* at 903 (subcellular and physiological). It defines "subclinical" as "[d]enoting the presence of a disease without manifest symptoms; may be an early stage in the evolution of a disease." *Id.* at 894 n. 3 (quoting *Stedman's Medical Dictionary* 1492 (25th ed. 1990)). The SJC wrote that it "leave[s] for another day consideration of cases that involve exposure to levels of chemicals or radiation known to cause cancer, for which immediate medical monitoring may be medically necessary although no symptoms or subclinical changes have occurred." *Id.* at 901.

In view of *Donovan I*, the claims of the Genereux family members to medical monitoring were reinstated. *See* Mar. 31, 2010 Order (Gertner, J.) (reconsidering dismissal); Apr. 28, 2010 Order (Gertner, J.) (reinstating Raytheon as a defendant). *Bettuchy* was filed on September 28, 2010, by counsel for the plaintiffs in *Genereux*. On January 24, 2011, the two cases were consolidated for pre-trial purposes.

The operative complaints in both *Genereux* and *Bettuchy* seek to state claims based on the cause of action defined and validated in *Donovan I*. Among other

things, the complaints specifically allege that "[p]laintiffs have experienced subcellular changes to their persons." Bettuchy Compl. ¶¶ 26(d), 28(c), 42; Genereux Compl. ¶ 64.

B. *The Motion for Summary Judgment*

Raytheon filed its Motion for Summary Judgment on October 12, 2012. The Motion for Summary Judgment alleges "a specific infirmity of Plaintiffs' claim." Mem. Supp. Mot. Summary Judgment 1 n. 1 ("Summ. J. Memo"). It relies on the SJC's holding in *Donovan I* that plaintiffs seeking medical monitoring must prove that a hazardous substance "produced, at least, subcellular changes." 914 N.E.2d at 901–02. Raytheon contends that plaintiffs' own expert testified that he cannot state, with reasonable medical certainty, that any plaintiff has suffered subcellular change. Summ. J. Memo at 3–6 (quoting Newman Dep., Aug. 23, 2011, at 91–98 ("Newman Dep.")).

Plaintiffs respond that the Motion for Summary Judgment "ignores the rationale" behind *Donovan I*. The thrust of that decision, they argue, was that individuals exposed to dangerous substances and placed at an increased risk of harm should be entitled to medical monitoring. *See* Incorp. Mem. Law Resp. Def.'s Mot. Summ. J. 1, 7 ("Opp'n Memo"). Plaintiffs maintain that the SJC, in *Donovan I,* was concerned that the "potential class of cigarette smokers ... would improperly include casual or short-term smokers who were not at an increased risk for developing lung cancer." Opp'n Memo at 7–8. In the current cases, plaintiffs assert, "[t]here is no concern for false claims." *Id.* at 8. Plaintiffs contend, therefore, that the key elements they must prove at trial are exposure to beryllium and an increased risk of disease. *See id.* at 1, 3, 8–9.

In addition, plaintiffs assert that their medical expert, Dr. Lee Newman, has stated that plaintiffs " 'would be at a significant increased risk of developing subcellular changes.' " *Id.* at 11 (quoting Newman Dep. at 92). Plaintiffs argue that this expert opinion is sufficient to permit their claims to go to trial.

Finally, plaintiffs briefly mention the question left by the SJC "for another day." They state that the SJC's "decision in *Donovan I* may not fit every type of chemical exposure case that nevertheless requires the medical monitoring remedy." *Id.* at 13.

The Motion for Summary Judgment, filed in the consolidated cases, referred only to the *Bettuchy* suit explicitly. However, the positions asserted by the parties apply to the *Genereux* suit as well. After consulting with the parties, the court informed them that it "will be treating this motion as a motion for summary judgment in both the *Bettuchy* class action and the *Genereux* individual action." May 10, 2013 Order (citing Apr. 26, 2013 Tr. 4–5). The oral argument proceeded on this understanding, with the parties addressing the evidence relating to the plaintiffs in both cases.

C. *Subsequent Proceedings*

Several other motions are pending in these cases, including Raytheon's Motion for Partial Dismissal, plaintiffs' Motion for Class Certification, and Raytheon's *Daubert* Motion. On April 26, 2013, a status conference was held. After discussing the issue with the parties, the court stated its intention to decide the Motion for Summary Judgment before the other pending motions.

At the April 26, 2013 conference, the court noted that plaintiffs' complaints allege subcellular change. The court explained its view that plaintiffs would, therefore, be required to prove subcellular

change in order to prevail on the merits. Apr. 26, 2013 Tr. 6–7. Focusing on *Bettuchy,* the court stated:

> The SJC, in *Donovan [I],* left open the issue of whether a cause of action could be stated for plaintiffs who did not allege that they had any symptoms or subclinical changes. However, as I read it at the moment, the amended complaint does not appear to present that issue.
>
> \* \* \* \* \* \*
>
> [I]f I were hearing that motion today, [I] would be focusing on whether there was sufficient evidence of subcellular change on behalf of any of the named plaintiffs. . . .

Apr. 26, 2013 Tr. 7, 12; *see also id.* 13–14, 15–16 (similar). Plaintiffs' counsel agreed with this characterization of these actions. *See id.* at 14, 16, 17–18. More specifically, after the court noted that in *Donovan I* the SJC held that subcellular change had to be proven to obtain relief in the form of medical monitoring, plaintiffs' counsel stated that, "in candor, if you were to determine, on a summary judgment basis, that one or another of the elements from *Donovan* can't be satisfied in this case, then I think it would be dispositive" of the class claims in *Bettuchy. Id.* at 14. Similarly, after the court stated that it did not "plan to decide the issue the SJC said 'it left open for another day,'" *id.* at 15 (quoting *Donovan I,* 914 N.E.2d at 901), plaintiffs' counsel responded, "I agree, your Honor," *id.* at 16. He also confirmed that plaintiffs' positions were stated in plaintiffs' submissions concerning the Motion for Summary Judgment, and that these positions were based on the record that had been presented to the court. *See id.* at 20.

On May 10, 2013, however, plaintiffs moved to file a sur-reply brief in opposition to the Motion for Summary Judgment. The proposed sur-reply relied, as an alternative argument, on the SJC's statement that it leaves "for another day" cases in which medical monitoring may be medically appropriate "although no symptoms or subclinical changes have occurred." *Donovan I,* 914 N.E.2d at 901. Plaintiffs argued that the court "has the power to make an *Erie* guess as to how the SJC would resolve the issue." Pl.'s Sur–Reply Br. in Opp'n 4–6 ("Proposed Sur–Reply").

Plaintiffs' request to file the sur-reply brief was denied. The court explained that these cases were filed years ago, and that the Motion for Summary Judgment has long been fully briefed. *See* May 29, 2013 Mem. & Order 1–2, 6–7. The court stated that the April 26, 2013 conference sought to establish:

> a common understanding of the issues posed by the Motion for Summary Judgment. This common understanding includes the premise, which follows from plaintiffs' complaints, that in order to prevail, plaintiffs will be required to prove that they have suffered subcellular change.

*Id.* at 6. The court found that the proposed submission would alter the scope of the issues presented by the Motion for Summary Judgment. *See id.* In the circumstances, the court denied the motion to file the sur-reply brief because "[a]llowing [it] would require further briefing by defendant, delay the June 10, 2013 hearing, and frustrate the court's efforts to manage its docket fairly and effectively." *Id.* at 7. Subsequently, the court denied plaintiffs' motion for reconsideration of this decision. *See* June 5, 2013 Mem. & Order.

A hearing on the Motion for Summary Judgment was held on June 11, 2013.

## III. THE SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any mate-

rial fact and the movant is entitled to judgment as a matter of law." A factual dispute, therefore, precludes summary judgment if it is "material" and "genuine." *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A fact is "material" if, in light of the relevant substantive law, "it has the potential of determining the outcome of the litigation." *Maymi v. Puerto Rico Ports Auth.*, 515 F.3d 20, 25 (1st Cir.2008); *Martinez–Rodriguez v. Guevara*, 597 F.3d 414, 419 (1st Cir.2010). "Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

To determine if a factual dispute is "genuine," the court must assess whether " 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 43 (1st Cir.2009) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505); *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 24 (1st Cir.2009). In making this determination, the court must "constru[e] the record in the light most favorable to the non-moving party." *Douglas v. York Cnty.*, 433 F.3d 143, 149 (1st Cir.2005); *Montalvo v. Gonzalez–Amparo*, 587 F.3d 43, 46 (1st Cir.2009). The record should not, however, be scrutinized piecemeal; rather, it must be "taken as a whole." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Kelly v. Cort Furniture*, 717 F.Supp.2d 120, 122 (D.Mass.2010). Evidence submitted in inadmissible form may be considered only if it could be presented in a form that would be admissible at trial. *See* Federal Rule of Civil Procedure 56(c)(2); *Gorski v. New Hampshire Dep't of Corr.*, 290 F.3d 466, 475–76 (1st Cir.2002); *Vazquez v. Lopez–Rosario*, 134 F.3d 28, 33 (1st Cir.1998).

■ The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the moving party's burden "may be discharged by 'showing' ... that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. Summary judgment is, therefore, mandated "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548; *Gorski*, 290 F.3d at 475–76; *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 12 (1st Cir.1994).

## IV. EVIDENCE

### A. The Evidence in the Record

Raytheon's Motion for Summary Judgment relies on evidence presented by plaintiffs. The evidence pertinent to this motion is plaintiffs' evidence concerning the physical effects that exposure to beryllium has had on them. On this issue, plaintiffs rely on the opinions of Dr. Newman.

Dr. Newman submitted expert declarations on June 29, 2010 and on March 8, 2011. In these declarations, Dr. Newman described CBD as a "multisystem granulomatous disorder that can cause significant disability or even premature death." Newman Decl., Mar. 8, 2011, ¶ 23 ("Newman 2011 Decl."). Dr. Newman opined that individuals exposed to elevated levels of beryllium, including plaintiffs, are "at a significantly increased risk for the development of beryllium related health effects in

relation to an unexposed population." *Id.* In his view, medical monitoring is, consequently, warranted for such individuals. *See id.* ¶¶ 11, 19, 23.

Dr. Newman described the process used to detect beryllium-related effects. This process generally relies on a test known as the BeLPT (the "Beryllium Lymphocyte Proliferation Test"). The BeLPT can detect beryllium sensitization, a condition that is sometimes a precursor to CBD. *See* Newman 2011 Decl. ¶ 6; *see also* Newman Dep. at 142, 164–65. Dr. Newman explained that "[b]eryllium sensitization is diagnosed with two abnormal BeLPTs." Newman 2011 Decl. ¶ 19.[1]

Dr. Newman stated, in his declarations, that "within a population of persons exposed to beryllium above background, some number of persons will have cellular changes in the blood or lung cells." *Id.* ¶ 12. Dr. Newman did not state that all individuals exposed to elevated beryllium levels necessarily suffer subcellular change. He also did not state that any specific plaintiff or plaintiffs have suffered beryllium-related subcellular change. He reported that "Barry, Krista and Angela Genereux, Claire and Francis Balint, and Ernest Bettuchy have each previously had a normal BeLPT," and that "Jennifer Bettuchy has never been tested." *Id.* ¶ 21.

The BeLPT test results for the plaintiffs in *Bettuchy* are also included in plaintiffs' responses to Raytheon's interrogatories. *See* Howe Aff. Exs. 2–5. Plaintiffs' interrogatory responses match the information provided in Dr. Newman's declaration. Plaintiffs also report that plaintiff Claire Balint had one abnormal BeLPT, on March 16, 2005. *See* Howe Aff. Ex. 4, at 4. This abnormal result was followed by two

normal results, however, on April 12, 2005 and June 27, 2006. *See id.*

In their motion to file a sur-reply, plaintiffs sought to introduce into the record a document reporting Ms. Balint's abnormal BeLPT result. *See* Motion to File at 2–3. Plaintiffs did not proffer Ms. Balint's two subsequent normal test results. Nevertheless, the court has considered the document submitted by plaintiffs. Raytheon did not specifically object to this request. In any event, the information in the document was already included in the record in plaintiffs' responses to Raytheon's interrogatories.

Dr. Newman provided additional testimony at a deposition taken on August 23, 2011. At his deposition, Dr. Newman reiterated his view that individuals exposed to elevated levels of beryllium are "at an increased risk of developing subcellular and other physiologic and clinical abnormalities." Newman Dep. at 91–92. He agreed, when asked, that "beryllium sensitization ... is the first evidence of the subcellular change you would detect." *Id.* at 165.

Dr. Newman also testified that he cannot state whether any one or more of the plaintiffs has suffered subcellular change. *See id.* at 91–94. With regard to each of the plaintiffs, he was asked whether he could state to a reasonable medical certainty that each plaintiff "has had any subcellular or physiologic response as a result of an alleged exposure to beryllium at Raytheon." *Id.* at 92, 94, 95, 96, 97, 103. In each instance, he replied that he "cannot say that at this time." *Id.* at 95; *see also id.* at 92, 95–96, 97, 98, 103.[2] Dr. Newman was then asked whether he can "state, to a reasonable medical certainty,

---

**1.** Dr. Newman added that "[i]f a person has had a single positive test with a second test that is normal, another test should be obtained in one year. At this time, if there are one or more abnormal tests on retesting (for a

total of two abnormal BeLPTs), the individual should be offered clinical evaluation." Newman 2011 Decl. ¶ 19.

**2.** The deposition transcript reads as follows:

that any of the putative potential class members ... have had any subcellular or physiologic changes as a result of alleged exposure to beryllium at the Raytheon plant in Waltham?" *Id.* at 97–98. He replied:

Without further information ... I can't say at this time. Pending more information, that opinion could change as I learn more about exposure and the testing that has been done in those individuals.

*Id.* at 98.

## B. *Evidence Not in the Record*

The record before the court does not include one additional declaration prepared by Dr. Newman, dated April 18, 2012. This declaration, and a declaration by Dr. John Martyny, were attached to plaintiffs' Motion for Class Certification. Raytheon moved to strike these two declarations be-

cause the deadline for the expert discovery had long passed. The court allowed Raytheon's motion, noting that "[t]his decision is subject to possible reconsideration based on matters discussed at the status conference" held on April 26, 2013. *See* March 14, 2013 Order, ¶ 4. Plaintiffs did not ask that this decision be reconsidered at the status conference. Nor have they done so since.

In any event, it does not appear that Dr. Newman's April 18, 2012 declaration offers new evidence. Dr. Newman does not state in that declaration that he seeks to alter the opinions he previously expressed. Indeed, plaintiffs asserted, in response to Raytheon's motion to strike plaintiffs' new expert declarations, that these declarations "do not contain any new opinions or analysis." Pls.' Opp'n to Def.'s Mot. to Strike 1. Plaintiffs have not retracted this assertion.[3]

Q. ... How are you able to determine, as you sit here today, whether or not Barry Genereux has had any subcellular changes in his body as a result of any alleged exposure to beryllium at the Raytheon plant?

A. I can know it by virtue of information, if I were given information about exposure, to know that those individuals are at an increased risk of developing subcellular and other physiologic and clinical abnormalities.

I can't say, sitting here today, about that one individual. I don't have enough information, sitting here today, to be able to answer that. ...

Q. My question was really about today. As you sit here today, August 23, 2011, are you able to say, to a reasonable medical certainty, that Ernest Bettuchy has had a subcellular or physiologic response as a result of an alleged exposure to beryllium at Raytheon?

A. Not without the additional information that I described in my last statement. ...

Q. Let me ask you the same question about Claire Balint. Can you state, to reasonable medical certainty, whether Claire Balint has had any subcellular or physiolog-

ic changes as a result of any alleged exposure to beryllium, from Raytheon?

A. Not without the additional information that I already described to you earlier. No, not at this time. ...

Newman Dep. at 91–96; *see also id.* at 96–97 (same for Francis Balint); *id.* at 97–98 (same for Jennifer Bettuchy); *id.* at 102–03 (same for Krista Genereux); *id.* at 103 (same for Angela Genereux).

3. Dr. Newman's 2012 declaration does state that "[e]xposure to beryllium causes subcellular changes that substantially increase the risk of becoming sensitized and developing CBD." Newman Decl., Apr. 18, 2012, ¶ 7. Read in isolation, this statement could, arguably, be understood to mean that beryllium exposure *necessarily* causes subcellular change. *Cf.* Proposed Sur–Reply at 1. This sentence should not be read in isolation, however; rather, it must be understood in light of the record as a whole. *See Matsushita Elec.*, 475 U.S. at 587, 106 S.Ct. 1348. In the context of the entire record, Dr. Newman's statement indicates that exposure to beryllium *can* cause subcellular change. Similarly, Dr. Newman states that "[b]eryllium exposure causes chronic beryllium disease (CBD)." Newman 2011 Decl. ¶ 5. Plaintiffs agree that this does

At the June 11, 2013 hearing, the court decided not to hear testimony from the parties' expert witnesses. The parties had previously been ordered to have their witnesses available to testify at the hearing, if necessary. *See* Apr. 29, 2013 Order, ¶ 2. Raytheon did not ask to present testimony regarding the Motion for Summary Judgment. Plaintiffs sought to present testimony from Dr. Newman. In their Motion to File, plaintiffs asserted that "Dr. Newman's testimony ... will explain and illuminate how exposure to beryllium *necessarily* causes subcellular harm." Motion to File at 3 (emphasis added).

■ In the decision denying the motion to file the sur-reply brief, the court noted that "the First Circuit has 'repeatedly held that a party opposing summary judgment may not manufacture a dispute of fact by contradicting his earlier sworn testimony without a satisfactory explanation of why the testimony is changed.'" May 29, 2013 Mem. & Order 7–8 (citations omitted) (quoting *Abreu–Guzman v. Ford*, 241 F.3d 69, 74 (1st Cir.2001) and *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4– 5 (1st Cir.1994); and citing *Rockwood v. SKF USA Inc.*, 687 F.3d 1, 12 (1st Cir. 2012)). The court stated, therefore, that it would not be likely to "hear expert testimony unless it determines that the experts' previous testimony requires clarification." *Id.*

■ The expert testimony pertinent to the Motion for Summary Judgment, Dr. Newman's testimony, does not require clarification. Dr. Newman's declarations state clearly that "within a population of persons exposed to beryllium above background, some number of persons will have

cellular changes in the blood or lung cells." Newman 2011 Decl. ¶ 12. As discussed earlier, Dr. Newman said the same in his deposition, stating that plaintiffs and other similarly situated individuals are "at a significant increased risk of developing subcellular changes." Newman Dep. at 92. In response to repeated questioning, Dr. Newman testified that he "can't say at this time" whether any particular plaintiff has suffered subcellular change as a result of exposure to beryllium. *Id.* at 94–98. Dr. Newman's testimony has, therefore, been clear and consistent. Plaintiffs did not represent that Dr. Newman would alter his prior statements or offer any explanation as to why he might wish to do so. It was, therefore, not necessary or appropriate for the court to hear Dr. Newman's proposed testimony. *See* Federal Rule of Civil Procedure 56(c)(1) (listing the forms of evidence generally appropriate at summary judgment); *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir.2000) ("oral testimony on summary judgment motions should be used sparingly and with great care"); *MacLean v. Parkwood, Inc.*, 247 F.Supp. 188, 190 (D.N.H.1965) (affidavits are preferable to oral testimony in summary-judgment proceedings), *aff'd*, 354 F.2d 770 (1st Cir.1966); 10A Charles A. Wright et al., *Federal Practice and Procedure* § 2723 (3d ed. 2010) (collecting sources).

## V. FACTS

Viewing the evidence in the light most favorable to the plaintiffs, it is sufficient to prove the following facts.

---

not mean that beryllium exposure *necessarily* causes CBD, but rather that such exposure *can* cause CBD. *See, e.g.,* Apr. 26, 2013 Tr. 47. Correspondingly, the statement that "[e]xposure to beryllium causes subcellular change" must be interpreted to mean that exposure to

beryllium *can* cause subcellular change in view of Dr. Newman's previous declarations and his deposition testimony. Neither Dr. Newman nor plaintiffs have indicated that Dr. Newman seeks to alter his prior testimony or declarations.

Raytheon handled beryllium negligently at its Waltham facility. For the limited purpose of the Motion for Summary Judgment, Raytheon does not contest this point.

Plaintiffs were, as a consequence of Raytheon's conduct, exposed to beryllium. Some plaintiffs were exposed to beryllium directly, by working at Raytheon's Waltham plant. Other plaintiffs were exposed indirectly, through contact with members of their households who worked at that plant. These assertions are also not contested for present purposes.

All individuals exposed to levels of beryllium above ordinary levels are at an increased risk of adverse health effects. *See* Newman 2011 Decl. ¶¶ 5, 6, 23. These adverse health effects, and particularly CBD, may be disabling, even life-threatening. *See id.* ¶ 5.

All individuals exposed to elevated levels of beryllium are at an increased risk of suffering harmful subcellular change. *See* Newman 2011 Decl. ¶ 7; Newman Dep. at 91–92. Subcellular change is first detectable as beryllium sensitization. *See id.* at 165. The test used to detect beryllium sensitization is the BeLPT. *See* Newman 2011 Decl. ¶ 6. The BeLPT sometimes yields false positive results. *See id.* ¶ 8. A determination that a person is sensitized to beryllium is made on the basis of two abnormal BeLPT results. *See id.* ¶ 19–20. No plaintiff in *Genereux* or *Bettuchy* has had two abnormal BeLPT tests. *See id.* ¶ 21; Howe Aff. Exs. 2–5.[4]

## VI. ANALYSIS

### A. *Subcellular Change Is a Necessary Element of Plaintiffs' Case*

 The elements of a cause of action for medical monitoring, as defined by the SJC, include the requirement that "the plaintiff [was] exposed to a hazardous substance that produced, at least, *subcellular changes* that substantially increased the risk of serious disease, illness, or injury." *Donovan I*, 914 N.E.2d at 902 (emphasis added). The "subcellular change" element serves two primary purposes.

First, the "subcellular change" element ties the modern doctrine of medical monitoring into traditional tort law: "the physiological changes with the attendant substantial increase in risk of cancer, and the medical necessity of monitoring with its attendant cost, may adequately establish the elements of injury and damages." *Id.* at 901. Judge Gertner addressed this point in her decision, following *Donovan I*, to certify the class of smoker plaintiffs. *See Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1 (D.Mass.2010) (Gertner, J.) ("*Donovan II*"). In that decision, the court explained that the SJC "made clear it was not creating a new cause of action so much as addressing how subcellular injury and increased risk of illness fit into the traditional causes of action." 268 F.R.D. at 24.

In addition, the SJC explained that the "subcellular change" element serves as a check on the ability of plaintiffs seeking medical monitoring to prevail merely on the basis of increased risk of harm. As

---

**4.** At the June 11, 2013 hearing, plaintiffs' counsel suggested that a single abnormal BeLPT result indicates subcellular change and that Claire Balint's single abnormal BeLPT adequately supports plaintiffs' allegation of subcellular change. However, this suggestion by counsel is not supported by any evidence in the record. Specifically, Dr. New-

man did not state, in his declarations, that Balint has suffered subcellular change, and at deposition he testified that he "cannot say that at this time" whether Balint has suffered such change. Newman Dep. at 95–96. Dr. Newman was aware of Balint's abnormal BeLPT test, since he administered the test himself.

the SJC stated, "[n]o particular level or quantification of increase in risk of harm is necessary, so long as it is substantial and *so long as there has been at least a corresponding subcellular change.*" *Donovan I,* 914 N.E.2d at 901 (emphasis added).

The SJC noted that there may possibly be cases in which proving "subcellular change" would not be required. As indicated earlier, the court stated that it "leave[s] for another day consideration of cases ... for which immediate medical monitoring may be medically necessary although no symptoms or subclinical changes have occurred." *Id.* at 901. The SJC did not, however, decide that such cases would state a cause of action under Massachusetts law.[5]

Plaintiffs' complaints rely on the cause of action defined by the SJC in *Donovan I,* not on the SJC's remark that the "subcellular change" requirement might possibly be relaxed in the category of cases left "for another day." The operative complaints allege that plaintiffs have "experienced subcellular changes to their persons." Bettuchy Compl. ¶¶ 26(d), 28(c), 42; Genereux Compl. ¶ 64. This court has repeatedly highlighted these allegations and the fact that they require that plaintiffs prove subcellular change in order to prevail on the merits of the claims they have asserted. *See* Apr. 26, 2013 Tr. 7, 12–16; May 29, 2013 Mem. & Order; June 5, 2013 Mem. & Order. Plaintiffs concurred with this characterization of their actions. *See* Apr. 26, 2013 Tr. at 16, 17–18. They have not sought to amend their complaints to withdraw the allegations of subcellular change. Subcellular change is, therefore, a necessary element of plaintiffs' causes of action.

## B. *Plaintiffs Have Not Offered Any Evidence of Subcellular Change*

■ The burden to prove subcellular change at trial would be on plaintiffs. *See Donovan I,* 914 N.E.2d at 901–02 ("each plaintiff must prove ... subcellular changes"). Consequently, in order to defeat the Motion for Summary Judgment, each plaintiff must submit sufficient admissible evidence to permit a reasonable fact finder to find that he or she has suffered subcellular change. *See Chadwick,* 561 F.3d at 43; *Gorski,* 290 F.3d at 475–76. If plaintiffs all fail to do so, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

Examining the record as a whole in the light most favorable to plaintiffs, a reasonable fact finder could not conclude that plaintiffs have suffered subcellular change. Most directly, Dr. Newman, plaintiffs' medical expert, has not opined that any plaintiff has suffered subcellular change. At his deposition, Dr. Newman testified repeatedly that he cannot now determine whether any of the plaintiffs has suffered subcellular change.

In addition, the record indicates that subcellular change would first be detectable as beryllium sensitization. Beryllium sensitization is diagnosed by two abnormal BeLPT results. No plaintiff has had two such results. Consequently, it could not be reasonably found that any plaintiff has suffered subcellular change.

Finally, a conclusion that plaintiffs have suffered subcellular change cannot be inferred from plaintiffs' exposure to elevated

---

**5.** Prior to the April 26, 2013 status conference, the parties were ordered to state their positions concerning whether the question left "for another day" in *Donovan I* should be certified to be answered by the SJC. *See* Mar. 14, 2013 Order, 110. The parties reported that they opposed certification. *See* Joint Report, Apr. 12, 2013.

levels of beryllium alone. Dr. Newman's testimony does not indicate that every individual exposed to elevated levels of beryllium suffers subcellular change. Nor does it indicate that most individuals exposed to elevated levels of beryllium suffer subcellular change. Rather, it is Dr. Newman's position that individuals exposed to elevated beryllium levels are "at an increased risk" of subcellular change, and that within a population of persons exposed to beryllium, "some number" will suffer subcellular change. *See* Newman Dep. at 91–92; Newman 2011 Decl. ¶ 12. As Dr. Newman clarified at his deposition, this "increased risk" does not cause him to conclude that any one or more of the plaintiffs have suffered subcellular change. *See* Newman Dep. at 92, 95–96, 97, 98, 103.

Standing alone, "increased risk" of subcellular change is insufficient to prove plaintiffs' claims for medical monitoring. It does not satisfy the requirement of *Donovan I* of a physiological "impact" that fits the medical-monitoring doctrine into the rubrics of traditional tort law and tempers the prospect of purely risk-based recovery. *See Donovan I*, 914 N.E.2d at 900–01.

Contrary to plaintiffs' contention, this conclusion is not inconsistent with Judge Gertner's reasoning in *Donovan II*. In *Donovan II*, Judge Gertner was deciding whether to certify a class rather than deciding a motion for summary judgment, *see* 268 F.R.D. at 15–16, and the applicable standards are different. More significantly, the evidence in *Donovan II* was materially different than the evidence in the instant case. In *Donovan II*, plaintiffs' experts opined that "twenty pack-years of smoking *necessarily* causes subcellular harm" and that "*everyone* with a twenty pack-year smoking history has suffered subcellular harm." *Id.* at 16 (emphasis added). In contrast, as explained previously, Dr. Newman has only opined that plaintiffs are at increased risk of suf-

fering subcellular harm because of their exposure to beryllium and he cannot, and does not, say that any plaintiff has actually suffered such harm.

In summary, the record, viewed in the light most favorable to plaintiffs, would not permit a reasonable trier of fact to conclude that plaintiffs have suffered subcellular change as a result of exposure to beryllium. Because subcellular change is a necessary element of plaintiffs' cause of action, the Motion for Summary Judgment is meritorious.

## VII. ORDER

In view of the foregoing, it is hereby ORDERED that defendant's Motion for Summary Judgment and Request for Oral Argument (*Genereux* Docket No. 333) is ALLOWED. Therefore, judgment shall enter for the defendant in *Genereux* and *Bettuchy*.