# United States Court of Appeals
## For the First Circuit

No. 13-1921

BARRY GENEREUX ET AL.,

Plaintiffs, Appellants,

v.

RAYTHEON COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Torruella and Selya, Circuit Judges,
and McAuliffe,[*] District Judge.

Ruben Honik, with whom Kevin W. Fay, Golomb & Honik, P.C., Michael B. Bogdanow, and Meehan, Boyle, Black & Fitzgerald, P.C. were on brief, for appellants.
Jonathan M. Albano, with whom Janice W. Howe, Bingham McCutchen LLP, James F. Kavanaugh, Jr., Ronald M. Jacobs, and Conn, Kavanaugh, Rosenthal, Peisch & Ford, LLP were on brief, for appellee.
John Pagliaro and Martin J. Newhouse on brief for New England Legal Foundation and Associated Industries of Massachusetts, amici curiae.

June 10, 2014

[*]Of the District of New Hampshire, sitting by designation.

**SELYA, Circuit Judge.** A familiar bit of homespun philosophy warns of the perils of attempting to change horses in midstream. This admonition applies in litigation as well as in life. Thus, when a litigant commits to a theory of the case and sticks to that theory past the point of no return, he cannot thereafter switch to a different theory simply because it seems more attractive at the time. That is among the lessons of this appeal.

## I. BACKGROUND

We rehearse the facts in the light most favorable to the plaintiffs, who opposed summary judgment below. See RTR Techs., Inc. v. Helming, 707 F.3d 84, 87 (1st Cir. 2013). In the process, we reserve many important details for our later discussion of the issues.

Beryllium is a useful but hazardous substance, and even modest exposure can cause a malady known as Chronic Beryllium Disease (CBD). This malady, caused exclusively by beryllium exposure, is characterized by inflammation and scarring of lung tissue. It can seriously impair organ function. Although there is no known cure for CBD, early detection and treatment can ameliorate its ravages.

The pathogenesis of CBD begins with beryllium sensitization (BeS). Even though BeS is regarded as an abnormal medical finding, it can be asymptomatic and is typically not

treated. Nevertheless, persons with BeS should receive periodic clinical screenings to detect disease onset.[1] Those persons who are diagnosed with BeS alone are at a high risk of developing CBD during their lifetimes.

Since early detection of BeS is one key to effective treatment of CBD, current medical practice calls for all persons exposed to beryllium above background levels to be screened for BeS every three to five years using a beryllium lymphocyte proliferation test (BeLPT). The BeLPT sometimes yields false positives, so BeS is defined by no fewer than two positive BeLPT results. Because BeS and CBD can develop after a long latency period, those persons registering negative BeLPT results should be re-tested throughout their lifetimes.

We move now from the general to the specific. The plaintiffs in this case are various members of the Bettuchy, Balint, and Genereux families. The Bettuchys and the Balints are the named plaintiffs in a putative class action filed in the United States District Court for the District of Massachusetts, invoking federal diversity jurisdiction under the special jurisdictional provisions of the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Their complaint alleged that the defendant, Raytheon Company, endangered the health of the plaintiffs and others

---

[1] Indeed, some persons are simultaneously diagnosed with BeS and CBD.

-3-

similarly situated by negligently exposing them to beryllium used in the manufacturing process at its plant in Waltham, Massachusetts.[2]

The plaintiffs seek to represent two proposed classes. One comprises all persons who worked at the Waltham plant for at least one month prior to December 31, 1996. The other comprises all persons who lived with members of the first class and thus were subject to take-home beryllium exposure. Persons already diagnosed as having CBD (like Suzanne Genereux, see supra note 2) are excluded from both proposed classes.

The action seeks to compel Raytheon to establish a trust fund to finance appropriate medical monitoring for both classes of plaintiffs. As the plaintiffs envision it, such medical monitoring would include regular BeLPT testing.

Following extensive pretrial discovery and work devoted to a narrowing of the issues, the district court granted summary judgment in favor of Raytheon. See Genereux v. Hardric Labs., Inc., 950 F. Supp. 2d 329, 341 (D. Mass. 2013). This timely appeal ensued.

---

[2] The district court consolidated this class action with an earlier, non-class action brought by various members of the Genereux family against Raytheon. See generally Genereux v. Am. Beryllia Corp., 577 F.3d 350 (1st Cir. 2009). By that time, Raytheon had settled with Suzanne Genereux (who had contracted CBD). The Genereux plaintiffs, other than Suzanne Genereux, are now named plaintiffs here and assert that they are encompassed within the classes that the plaintiffs seek to represent.

## II. ANALYSIS

We review de novo a district court's entry of summary judgment. See Estate of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010). In assessing the propriety of such a disposition, we must take the record in the light most hospitable to the nonmovants (here, the plaintiffs) and draw all reasonable inferences in their favor. See Geshke v. Crocs, Inc., 740 F.3d 74, 76 (1st Cir. 2014). "If — and only if — the record, viewed in this light, discloses the absence of any genuine issue of material fact and reveals the movant['s] entitlement to judgment as a matter of law, we will affirm the summary judgment order." Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 66 (1st Cir. 2008); see Fed. R. Civ. P. 56.

Because this suit was brought in diversity jurisdiction, see 28 U.S.C. § 1332(d)(2), state law supplies the substantive rules of decision. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Katz v. Pershing, LLC, 672 F.3d 64, 72 (1st Cir. 2012). The parties (who agree on little else) proceed on the shared premise that Massachusetts law controls. Given the reasonableness of this premise, we readily accept it. See Katz, 672 F.3d at 72.

The cornerstone of an action for medical monitoring under Massachusetts law is the decision of the Massachusetts Supreme Judicial Court (SJC) in Donovan v. Philip Morris USA, Inc. (Donovan I), 914 N.E.2d 891 (Mass. 2009). There, a class of plaintiffs who

shared a history of at least twenty pack-years of smoking[3] but who had not yet developed lung cancer, sought to compel the defendant cigarette manufacturer to provide a court-supervised medical surveillance program for early cancer detection. See id. at 895. Although the suit did not fit the traditional tort mold because none of the plaintiffs actually had contracted cancer, the SJC acknowledged that Massachusetts tort law "must adapt to the growing recognition that exposure to toxic substances and radiation may cause substantial injury which should be compensable even if the full effects are not immediately apparent." Id. at 901. The court went on to rule that the cost of medical monitoring may be recoverable in a tort suit under Massachusetts law. See id.

The Donovan I court took pains to tether its holding to a doctrinal mooring: a combination of the defendant's failure to meet an appropriate standard of care, a causal connection between that failure and the plaintiffs' injuries, and resulting damages. See id. at 898-99. To identify the injury in the absence of evidence that a plaintiff actually has cancer, the court was careful to demand a showing that some subcellular or other physiological change has put him at increased risk. See id. at 901-02. Under the cause of action recognized in Donovan I,

_____

[3] As the SJC used the term, "pack-year" is the product of the number of years smoked and the average number of packs of cigarettes smoked per day over that period. See Donovan I, 914 N.E.2d at 895 n.6. For example, three years of smoking an average of two packs per day would be six pack-years.

increased epidemiological risk of illness caused by exposure, unaccompanied by some subcellular or other physiological change, is not enough to permit recovery in tort.

Beyond this particular cause of action, the SJC ruminated about another possibility. It pondered whether, if a manufacturer exposes a person to a dangerous carcinogen, a cause of action for medical monitoring would lie even though no subcellular or other physiological change had yet occurred. Id. at 901. The court made no ruling on this hypothetical set of facts but, rather, left the question "for another day." Id.

Against this backdrop, we turn to the plaintiffs' assignments of error.

## A. **The Plaintiffs' Principal Theory: Subcellular Change.**

The plaintiffs begin with a claim that their case fits snugly within the confines of Donovan I. The district court disagreed. See Genereux, 950 F. Supp. 2d at 340-41. The testimony of the plaintiffs' main expert, Dr. Lee S. Newman, sits at the fulcrum of the dispute.

Dr. Newman opined that BeS is the first manifestation of subcellular change resulting from beryllium exposure. He explained that, if the entire membership of both of the proposed plaintiff classes were to be tested, somewhere between one percent and twenty percent of those persons would be found to have BeS. Since beryllium exposure is the only known cause of BeS, this one percent

to twenty percent likelihood puts the plaintiff classes at appreciably higher risk of contracting CBD than a randomly selected baseline population.

Dr. Newman could not confirm, however, that any named plaintiff had as yet contracted BeS.[4] By the same token, he could not identify any particular member of either class known to have developed BeS.

The plaintiffs also point to their expert's testimony that all plaintiffs "are now at a significantly increased risk for the development of beryllium related health effects in relation to an unexposed population." In maintaining that this testimony is sufficient to bring them within the compass of Donovan I, they try to draw a parallel to expert opinion provided at a later stage of the Donovan litigation. This effort fails.

In Donovan I, the SJC answered questions transmitted by a federal district court. See Mass. S.J.C. Rule 1:03. In its subsequent class certification ruling, the federal district court

_____

[4] The plaintiffs note that one of the named plaintiffs, Claire Balint, experienced a single positive BeLPT result, which they say may be indicative of subcellular change. This observation is beside any relevant point for at least two reasons. First, it was not relied on below and, thus, it has no traction here. See Teamsters Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal."). Second, the plaintiffs' own expert testified that BeS is defined by two positive BeLPTs; one is not enough to show subcellular change.

-8-

relied on expert testimony that "<u>everyone</u> with a twenty pack-year smoking history has suffered subcellular harm [which] necessarily mean[s] increased risk of lung cancer." <u>Donovan</u> v. <u>Philip Morris USA, Inc.</u> (<u>Donovan II</u>), 268 F.R.D. 1, 16 (D. Mass. 2010) (emphasis in original). Here, however, the class members share no such universal harm. In sharp contrast to <u>Donovan II</u>, the expert testimony in this case shows only that every plaintiff faces a "significantly increased risk" of harm. Risk and harm are two materially different concepts, and Dr. Newman disclaimed any ability to state that any one plaintiff, named or otherwise, had already suffered harm (that is, subcellular or other physiological change). <u>Donovan II</u> is, therefore, of no help to the present plaintiffs.

The bottom line is that the summary judgment record discloses no evidence that any plaintiff — named or unnamed, employee class or take-home class — has as yet developed BeS. This gap in the proof is fatal to the plaintiffs' principal theory of liability. The plaintiffs bear the burden of producing evidence sufficient to preclude summary judgment, <u>see</u> <u>Certain Interested Underwriters at Lloyd's, London</u> v. <u>Stolberg</u>, 680 F.3d 61, 65 (1st Cir. 2012), and they have not carried that burden here. <u>Donovan I</u> defines actionable injury in the medical monitoring milieu in terms of subcellular or other physiological change, <u>see</u> 914 N.E.2d at

901-02, and the record reveals no significantly probative evidence of such an injury here.

### B. **The Plaintiffs' Alternative Theory**.

In an endeavor to obscure the portent of this lack of evidence, the plaintiffs assign error to the district court's rejection of an alternative theory of liability. They argue that a cause of action for medical monitoring under Massachusetts law does not require a showing of subcellular or other physiological change. This argument has two branches.

The first branch of the argument posits that Donovan I did not require a showing of subcellular or other physiological change as an element of a cause of action for medical monitoring. This theory rests on a strained attempt to recharacterize the SJC's discussion of "subcellular change" as mere dictum. The plaintiffs insist that policy considerations — principally the interest in allowing persons who have been placed at risk of harm by a defendant's conduct to get appropriate medical attention before it is too late — justify such a recharacterization.

The plaintiffs read Donovan I through rose-colored glasses. In that decision, the SJC made pellucid that it was holding only that a cause of action for medical monitoring would lie if a plaintiff could make a showing of subcellular or other physiological change.

To begin, the court listed this requirement as the third of seven elements of the approved cause of action. See id. at 902. Later in the opinion (when discussing the application of statutes of limitations), the court referenced "physiological change" as a triggering point for accrual of the cause of action. Id. at 903. To cinch matters, the court made it abundantly clear that it had considered the possibility of allowing a cause of action based on mere increased risk, but opted to leave that question "for another day." Id. at 901.

Where state tort law is at issue, policy considerations are best reconciled by state courts. The SJC is the final arbiter of Massachusetts law, and a federal court sitting in diversity jurisdiction has no roving writ to rewrite that court's pronouncements about state law. See Jones v. Secord, 684 F.3d 1, 10-11 (1st Cir. 2012). Nor can a federal court make an end run around this boundary by relabeling as dictum what is undeniably a part of a state court's holding. Consequently, we decline the plaintiffs' brash invitation to cast aside the SJC's unambiguous language.

The second branch of the plaintiffs' argument implicates the question that the SJC "le[ft] for another day," that is, the question of whether a cause of action for medical monitoring might lie when "no symptoms or subclinical changes have occurred." Donovan I, 914 N.E.2d at 901. This is precisely the plaintiffs'

-11-

situation, but the court below concluded that they had not preserved a claim under this alternative theory.  See Genereux, 950 F. Supp. 2d at 340.  Accordingly, the court refused to consider the claim on its merits.  See id.

In reaching the conclusion that the potential theory of liability that the SJC had "le[ft] for another day" had not been preserved, the court relied heavily on a status conference held after the summary judgment motion had been fully briefed (but before it was argued).  See id. at 333-34.  At that conference, which was designed to frame the issues presented by the pending summary judgment motion, the court stated its understanding that no claim based on the question that the SJC had "le[ft] for another day" was being pressed.  Plaintiffs' counsel agreed unreservedly. See id.

The plaintiffs labor to reinvent the April 26, 2013 status conference: they tell us that no such disclaimer took place. But the district court wisely arranged to have a court reporter record the status conference, and the transcript belies the plaintiffs' exercise in revisionist history.

The district court was meticulous in expressing its understanding of the scope of the action.  The court stated its understanding not once, but repeatedly; and plaintiffs' counsel concurred in the court's statement each and every time.  Examples

-12-

are rife.  For present purposes, however, we think it suffices to offer a few illustrations.

- The court twice described the issue that <u>Donovan I</u> left open and stated that it did not read the plaintiffs' complaint as presenting that issue. Plaintiffs' counsel agreed.

- The court noted that should Raytheon prevail on its summary judgment motion, "the plaintiffs might be able to file another case . . . on behalf of a class which has not experienced subcellular change."  To this, plaintiffs' counsel responded that the court had mapped out "an eminently reasonable way to proceed."

- After some potentially confusing dialogue, the court once again said that it did not regard the issue left open by <u>Donovan I</u> as properly before it.  Plaintiffs' counsel replied: "I think that's right, Judge . . . I mean, in candor, if you were to determine, on a summary judgment basis, that one or another of the elements from [<u>Donovan I</u>] can't be satisfied in the case, then I think it would be dispositive."

- The district judge later confirmed that "I don't plan to decide the issue the SJC said it 'left

-13-

for another day'" and reiterated that, on the summary judgment motion, he would be deciding whether or not the plaintiffs had made out a genuine issue of material fact as to the seven elements specified in Donovan I. Plaintiffs' counsel rejoined: "I agree, your Honor . . . ."

- Using a belt and suspenders approach, the judge again sought assurances that the plaintiffs' theory of the case required proof of already-incurred subcellular changes. Plaintiffs' counsel provided such an assurance, responding that the plaintiffs' claim was that subcellular changes were already present. He continued, "I think the [case is] still within the description of [Donovan I] . . . . [Y]ou may tell me that . . . the case really does squarely fall within the question that [Donovan I] didn't reach. Today I don't think that's the case . . . ."

In complex cases, considerations of both fairness and efficiency dictate that a trial judge use his best efforts to winnow and clarify the issues. In this case, Judge Wolf did exactly what was required. He was relentless in his insistence on ensuring that the parties shared a common vision of what issues were to be adjudicated; and he was fully entitled to rely on

-14-

counsel's repeated assurances that the issue that the <u>Donovan I</u>
court had "le[ft] for another day" was not in the case.

Plaintiffs' counsel had multiple opportunities to expound
a theory of the case that encompassed this issue.  He likewise had
multiple opportunities to correct the judge's repeated declarations
that the motion for summary judgment did not require adjudication
of the question that the SJC had "le[ft] for another day."
Plaintiffs' counsel let all of these opportunities slide.  And far
from disputing the court's understanding, counsel embraced it.

To be sure, there are snippets in the transcript that, if
taken in isolation, might sow the seeds of doubt.  But context is
important, and the status conference transcript, read as a whole,
is transparently clear: the plaintiffs told the court that they
were not pursuing a theory based on the question that the SJC had
"le[ft] for another day."  The transcript cannot fairly be read in
any other way.

There is one loose end.  The plaintiffs argue weakly that
the issue that the SJC "le[ft] for another day" was raised (and
thus preserved) in the amended class complaint and/or their written
opposition to Raytheon's motion for summary judgment. But both the
amended class complaint and the written opposition were filed well
before the status conference, and, in all events, the particular
passages to which the plaintiffs allude are freighted with

-15-

ambiguities. Only the most flattering reading of those papers lends the slightest support to the plaintiffs' current claims.

In the end, we need not parse these papers. At the status conference, plaintiffs' counsel time and again expressly represented to the court that the plaintiffs' case depended on their ability to prove subcellular change. As we have said before (and today reaffirm), "[w]e consider an express representation by an officer of the court to be a solemn undertaking, binding on the client." CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 622 (1st Cir. 1995); accord Ungar v. Arafat, 634 F.3d 46, 50 n.2 (1st Cir. 2011); United States v. Coady, 809 F.2d 119, 121 (1st Cir. 1987).

The short of it is that, during the status conference, counsel made clear and affirmative representations to the effect that the issue of whether a cause of action for medical monitoring might lie without proof of subcellular or other physiological change was not in the case. Where, as here, counsel makes such representations to the trial court and to the lawyers for the opposing party, neither he nor his clients can complain when the trial court takes them at their word. See Uncle Henry's Inc. v. Plaut Consulting Co., 399 F.3d 33, 49 (1st Cir. 2005); cf. Rivera-Velázquez v. Hartford Steam Boiler Insp. & Ins. Co., ___ F.3d ___, ___ (1st Cir. 2014) [No. 13-1301, slip op. at 10] (explaining that "in litigation matters, lawyers act for their clients," with the

result that the lawyer's actions are customarily binding on the party). Thus, the representations made at the status conference overrode any contrary suggestion that might have been contained in the plaintiffs' earlier filings.

That ends this aspect of the matter. The plaintiffs made a strategic decision to press a theory of the case that relied on the elements of the cause of action explicitly recognized in Donovan I. That theory having failed, they cannot now disavow their earlier decision and attempt to change horses midstream in hopes of finding a swifter steed.

### C. **The Disputed Procedural Ruling**.

There is one final issue, which involves the dimensions of the summary judgment record. For the purpose of opposing summary judgment, the plaintiffs wanted to rely upon a supplemental expert witness declaration (the 2012 Declaration) submitted to the district court in support of their motion for class certification. Raytheon countered by moving to strike the 2012 Declaration from the summary judgment record. In its motion, Raytheon noted that the 2012 Declaration had not been filed until some thirteen months after the deadline for expert witness submissions agreed to by the parties and confirmed in the district court's scheduling order. The district court granted the motion to strike.

The plaintiffs assign error.[5]  They argue that their reliance on the tardily filed 2012 Declaration worked no prejudice.

For good reason, the Civil Rules cede considerable control over discovery to district courts.  See Fed. R. Civ. P. 16, 26, 37.  This web of rules "permits district courts, among other things, to set temporal deadlines for the identification of experts and the disclosure of their opinions."  Martínez-Serrano v. Quality Health Servs. of P.R., Inc., 568 F.3d 278, 283 (1st Cir. 2009).  When a party flouts such a deadline, one customary remedy is preclusion.  See Macaulay v. Anas, 321 F.3d 45, 50 (1st Cir. 2003); Thibeault v. Square D Co., 960 F.2d 239, 246-48 (1st Cir. 1992); see also Fed. R. Civ. P. 37(c)(1).  But preclusion is not automatic, and a lapse may be excused if the court determines that, in the particular circumstances, a different remedy is more condign.  See Macaulay, 321 F.3d at 50; see also Fed. R. Civ. P. 37(c)(1)(C).

We review a district court's choice of sanction for late submissions under a deferential abuse of discretion standard.  See Macaulay, 321 F.3d at 51 (citing Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 642 (1976) (per curiam)).  In

_____

[5] At sundry times, the plaintiffs inveigh against the district court for rejecting their attempt to file an untimely and unauthorized surreply brief and for denying their request to present live evidence at the hearing on summary judgment.  These remonstrances are unaccompanied by any developed argumentation and, therefore, we deem them waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

conducting this tamisage, we consider the totality of the circumstances, including the overall history of the litigation, the importance of the precluded evidence, the justification (or lack of justification) for the delay, the nature and extent of prejudice to the other side, and the impact of the failure to comply with the discovery deadline on the district court's docket. See Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 78 (1st Cir. 2009). Here, the plaintiffs focus with laser-like intensity on an asserted lack of prejudice.

The plaintiffs' argument misses the mark for at least three reasons. First, the presence or absence of prejudice is only one of a myriad of factors that should be considered. See id. The plaintiffs virtually ignore all of the other relevant factors and, critically, proffer no explanation at all for the late submission. See Macaulay, 321 F.3d at 52 (affirming preclusion where "the appellant ha[d] not advanced any real justification for [the] tardy emergence" of a new expert report).

Second, the district court could reasonably have concluded that prejudice to Raytheon would result from allowing the plaintiffs to use the out-of-time 2012 Declaration. After all, Raytheon deposed the expert and probed his opinions long before the 2012 Declaration emerged, and that ground would have to be repastinated in light of the expert's newly advanced position. See Santiago-Díaz v. Laboratorio Clínico Y De Referencia Del Este, 456

F.3d 272, 277 (1st Cir. 2006) (weighing need to redo discovery as part of analysis of prejudice). So, too, its own experts likely would have to be re-interviewed. Taking new depositions and re-interviewing experts would undoubtedly increase Raytheon's expenses, a circumstance that can be considered as part of the prejudice calculus. See id.; Primus v. United States, 389 F.3d 231, 236 (1st Cir. 2004).

Last — but far from least — the plaintiffs' argument overlooks "the court's [strong] independent interest in administering its docket." Tower Ventures, Inc. v. City of Westfield, 296 F.3d 43, 46 (1st Cir. 2002). This is complex class action litigation, and the district court has the right — indeed, the duty — to ensure that such litigation proceeds in an orderly manner. Holding the parties to the strictures of a scheduling order helps to achieve this goal.

To say more would be pointless. Given the totality of the circumstances, it beggars credulity for the plaintiffs to argue that the district court abused its discretion in striking the egregiously late 2012 Declaration.[6]

---

[6] At the expense of carting coal to Newcastle, we add that allowing consideration of the 2012 Declaration would have been unlikely to affect the disposition of the case. The plaintiffs invite us to read the declaration's ambiguous statement that "beryllium causes subcellular changes" to mean that beryllium always causes subcellular changes. However, we agree with the district court that, read in the context of the declaration as a whole, the statement is better understood to mean that beryllium can cause subcellular changes. See Genereux, 950 F. Supp. 2d at

-20-

## III.  CONCLUSION

We need go no further.  We applaud the district court's handling of this complicated case and, for the reasons elucidated above, the judgment is

**Affirmed**.

---

337 n.3.  Understood in this sensible way, the 2012 Declaration adds nothing to the plaintiffs' asseverational array.