Joslin OKEN

v.

NATIONAL CHAIN CO.

No. 78–343–Appeal.

Supreme Court of Rhode Island.

Jan. 7, 1981.

Temkin, Merolla & Zurier, Melvin L. Zurier, Barry J. Kusinitz, Providence, for plaintiff.

Hinckley, Allen, Salisbury & Parsons, Michael P. DeFanti, Gordon P. Cleary, Providence, for defendant.

## OPINION

KELLEHER, Justice.

This is a jury-waived Superior Court civil action in which the plaintiff, Joslin Oken (Oken), seeks an accounting and payment of commissions allegedly withheld from him by his employer, the defendant, National Chain Co. (National). National manufactures chain which is used in the costume jewelry industry. The crucial issue in this controversy concerns the amount of money due Oken, and a brief resume of the relevant facts will bring the nub of the controversy into sharp focus.

On June 1, 1970, National's president, Ralph Cipolla, hired Oken as a manufacturer's representative. Oken's territory was Rhode Island and Massachusetts. Initially, he was paid a weekly salary, but within

four months his compensation was shifted to a commission basis. If "an account came into" National from Oken's territory, Oken would receive a commission even though he might have done nothing to obtain the account. Oken received the commission when the goods ordered were shipped. From this time until May 7, 1974, National agreed to pay Oken commissions on the following terms:

"Five (5%) percent of the sales price of items of gold-filled, sterling silver, brass and steel which were shipped by National to Oken's customers. Two-and-a-half (2½ %) percent of the sales price of 14 Karat gold items which were shipped by National to Oken's customers."

This commission schedule remained in effect until May 7, 1974, when National, citing the increased price of gold and silver, modified the commission structure. In brief, National retained the former commission rates but only up until the point at which Oken's earnings reached $25,000. Thereafter, commissions were to be computed by a sliding scale. For instance, once the $25,000 figure was reached, the commission rate for so-called semiprecious metals was reduced from 5 to 3 percent and the commission due for 14 karat gold items was reduced a full percentage point to 1½ percent. The bottom line in the structure called for a 1 percent commission on either line once Oken's earnings reached $45,000.

Oken and National were in disagreement about the meaning of the new commission structure and when it was to become effective. Oken insisted that he was entitled to his commission the moment when one of his customers placed an order with National even though payment was deferred until shipment. The lag time between the receipt of the order and its shipment could be as much as six months. On the other hand, National maintained that no commission was earned until the goods ordered were shipped to the customer. This difference in viewpoints became important because Oken was demanding payments for orders received prior to his firing in late October 1974 but delivered to the customer some-

time after Oken and National had gone their separate ways.

The trial justice depicted the respective positions of the litigants in the following fashion:

"Either he's entitled to be paid for goods shipped while he was in their employment or he's entitled to be paid for goods shipped pursuant to orders taken by him while he was in their employment, one or the other * * *."

The trial justice opted for the latter.

■ As a general rule a person employed on a commission basis to solicit sales orders earns or is entitled to his commission when the order is accepted by his employer. The entitlement to commissions is not affected by the fact that payment may be delayed, as in the present case, to the accounting period in which shipment is made. *Richer v. Khoury Bros., Inc.*, 341 F.2d 34 (7th Cir. 1965); *Weick v. Rickenbaugh Cadillac Co.*, 134 Colo. 283, 303 P.2d 685 (1956); *Diana v. Burnside Motors, Inc.*, 30 Conn.Sup. 561, 304 A.2d 222 (1973); *Kowal v. Sportswear By Revere, Inc.*, 351 Mass. 541, 222 N.E.2d 778 (1967); *Lundeen v. Cozy Cab Mfg. Co.*, 288 Minn. 98, 179 N.W.2d 73 (1970); *Elliott v. Clyde Garfield Oldsmobile-Cadillac, Inc.*, 107 N.H. 363, 222 A.2d 215 (1966); Williston, *Contracts* § 1017(c) at 181–82 (3d ed. 1967). Here, Oken's understanding of the employment agreement was that he was entitled to commissions on items when they were ordered even though payment was deferred until shipment. Specifically, he testified that he expected to be paid for those orders made prior to his firing on October 25, 1974, but shipped to customers after this date.

■ The general rule that a commission is earned when the order is placed is not absolute; it may be altered by a written agreement by, or the conduct of, the parties which clearly demonstrates a different compensation scheme. If National desired to make Oken's claim to a commission depend solely upon shipment, thus cutting off any commissions subsequent to termination of employment, it could have provided for such a contingency in clear and unam-

biguous language. Here, Oken conceded that he was not paid his commissions until the goods were shipped by National, but such a concession is not clear proof that he was in agreement that his commissions were not *earned* until shipment was made. Rather, this arrangement was but a manifestation of National's accounting procedures in regard to when commissions would be paid. *See Weick v. Rickenbaugh,* 134 Colo. at 288–89, 303 P.2d at 688.

A look at National's business picture demonstrates that this was the only sound accounting practice. As noted earlier, there could be a substantial time lag between receipt of an order and shipment of goods. Thus, National would have had a problem paying its salesmen at the time of the order since the cash did not come in until shipment. In addition, the amount of the commissions could be more accurately computed at the time of shipment because of fluctuations in the price of gold and silver.[1] Thus, National's practice of paying its salesmen upon shipment appears to reflect sound accounting practice rather than an agreement that a commission was not earned until shipment. It is the nature of commissions that payment be delayed until the goods are shipped. *See Lundeen v. Cozy Cab Mfg. Co.,* 288 Minn. at 101, 179 N.W.2d at 75. The general rule concerning commissions, which we have cited above, reflects the principle that commissions are *earned* when orders are placed but payments will be *deferred* until shipment. Otherwise, National would have received the value of Oken's procurements and servicing of accounts without fully compensating him for his labor. *See Lundeen v. Cozy Cab Mfg. Co.,* 288 Minn. at 101, 179 N.W.2d at 75.

National contends that certain previous payments to Oken compel a contrary result. Specifically, Oken's first commission check included commissions on shipments made pursuant to orders entered while he was a salaried employee, as well as on accounts existing before his employment. National

argues that this course of dealing indicates that it was the intent of the parties that the right to compensation would arise only if the goods ordered were shipped. Since Oken took commissions on accounts procured by previous salespersons, National claims, Oken could expect that salespersons who followed him would be accorded the same treatment. However, this event fails to give one the entire picture. Oken had already worked for four months before he received his first commission check. It is reasonable to conclude that Oken's first commissions were in return for the accounts he obtained and for his servicing of existing accounts.

The trial justice was confronted with a conflict concerning the terms of the litigants' agreement and the degree of vim and vigor with which Oken serviced the territory. Obviously, the trial justice believed Oken, both in respect to the terms of the agreement he had with National and in respect to the diligence and dedication he exhibited during the more than four years that Oken worked for National. We see no reason to fault the trial justice's adoption of Oken's version of what was National's obligation as far as the time commissions were earned and when they were paid.

■ Oken became aware of the change in the commission structure when, on May 8, 1974, he received National's letter about the change in the commission percentages. He took the position that the new structure became operative as of his receipt of the May letter. National, while admitting the ambiguity[2] of its epistle, maintained that the revised schedule of commissions was to apply to any commissions due and payable to Oken subsequent to December 31, 1973. The trial justice agreed with Oken, stating that he "was entitled to his commissions because he already earned them and he was never asked nor did he agree to give up his commission."

We believe the trial justice misconceived the evidence relating to this issue. Al-

---

1. *Another accounting factor is the reduction of commissions for orders not paid for.*

2. See Appendix.

though Oken never expressly agreed to National's interpretation regarding when the new rates took effect, the following evidence indicates he accepted the ultimatum given to him by National's president.

"Q. So after you received that letter you discussed it with Mr. Cipolla [National's president]. He told you exactly what he meant and he told you if you didn't like it, quit?

"A. That's right.

"Q. Did you quit?

"A. No.

\* \* \* \* \* \*

"Q. And he told you it was going to start at Jan. 1 and if you didn't like it you could quit?

"A. That's right."

By continuing his employment, Oken agreed to Cipolla's interpretation that the new rate structure would commence on January 1, 1974. *United Concrete Pipe Co. v. Spin-Line Co.*, 430 S.W.2d 360, 364 (Tex. 1968); Williston, *Contracts* § 68 at 27, § 78A at 260 (3d ed. 1957).

Oken argues that even assuming that by his actions he had accepted Cipolla's interpretation of the May 1974 letter, there was no consideration to support the modification of the employment agreement. *See Angel v. Murray*, 113 R.I. 482, 322 A.2d 630 (1974). We disagree. The trial justice found that the employment agreement was terminable at will, and we see no reason to upset that finding. Thus, Oken had no vested right to continued employment. The old commission structure was modified. The continuation of Oken's employment was sufficient consideration to support this modification. Williston, *Contracts* § 135A at 569 (3d ed. 1957); 1 Corbin, *Contracts* § 136 at 581 (1963). Oken had the option of continuing on Cipolla's terms or leaving the company. He chose the former.

Oken contends that he was coerced into this agreement. We see no evidence here of any coercion or bad faith by National. Instead, the company appears to have made a business judgment based upon a dramatic increase in the price of metals. *See Fortune v. National Cash Register Co.*, 373

Mass. 96, 364 N.E.2d 1251 (1977), where the court said, "[A]n employer needs flexibility in the face of changing circumstances." *Id.* at 102, 364 N.E.2d at 1256.

National's appeal is sustained in part and denied in part, the judgment appealed from is vacated, and the case is remanded to the Superior Court for a recomputation of the commissions due Oken; said recomputation is to be in conformity with the dictates of this opinion.

### APPENDIX

May 7, 1974

Joslin Oken
385 Oaklawn Avenue
Cranston, R. I. 02920    RE: Sales Commissions

Dear Jack:

Management has been trying to resolve a situation which, for the most part, has been unfair to a National Chain with its present arrangement.

Because of the additional cost in Gold, Sterling Silver and, in particular, the cost in Spring Rings, the dollar sales has reflected in much higher proportions than the increase in footage. For this reason, there will be some changes in the Commission Rates which we feel is completely fair and, certainly, will give the Sales Force continued incentive to increase volume and not only dollar value. We will not disturb the Commission Rates of earnings for the first $25,000. The Commission Rates over $25,000 will be as follows:

|  | G/F – S/S | 14KT |
|---|---|---|
| up to $25,000 | 5% | 2½% |
| $25,000–$35,000 | 3% | 1½% |
| $35,000–$45,000 | 2% | 1% |
| $45,000–$75,000 n | 1% | 1% |

Again, I wish to stress that this is a fair arrangement for the obvious reason that it does not cut back any of the total Commissions earned in the years past and will still give the incentive for potential earnings and growth for both the Salesman and Company. The Management is doing this for the obvious reason that the gain in Commissions earned reflect strictly in our cost increase and not in our earning increase.

Very truly yours,

NATIONAL CHAIN COMPANY

Ralph L. Cipolla
President

RLC/kmc