Mary E. GRADY

v.

Thomas J. GRADY.

No. 83–293–Appeal.

Supreme Court of Rhode Island.
Jan. 22, 1986.

William Y. Chaika, Chaika & Loffredo, Cranston, for plaintiff.

Joseph J. McGair, Petrarca & McGair, Warwick, for defendant.

## OPINION

KELLEHER, Justice.

The litigants in this Superior Court civil action were married in August 1962 and are the parents of two children. In July 1973 the husband left Rhode Island and took up residence in Nevada where in September 1973 he obtained an ex parte divorce. He returned to Rhode Island on the day before Christmas 1973. Subsequently, in early May 1974, the litigants entered into an agreement[1] calling for a variety of payments, including alimony, child support, and the children's education. Later, in August 1977, the wife instituted this suit, alleging that her husband had failed to comply with the provisions of the agreement. Time marched on, and in February 1983 a Superior Court jury came back with a verdict for the wife for $49,000, "no interest." Hereafter we shall refer to the litigants by their first names.

Thomas's motion for a new trial was denied, and we are confronted with cross-appeals. Thomas faults the trial justice for several rulings made during the trial, including portions of the charge to the jury and the rejection of his new-trial motion. Mary, on the other hand, complains about the trial justice's refusal to impose prejudgment interest. In considering Thomas's appeal, we shall discuss only those claims of error that, in our opinion, merit some consideration.

---

1. The agreement also provided that it would not be merged into any final decree "but shall survive the same and shall be binding and conclusive upon the parties hereto."

At trial Thomas sought to produce evidence indicating that because of his financial straits he was unable to meet the commitments that he had undertaken and sought to establish the defenses of "impossibility of performance" and "unconscionability" of the agreement. He also criticizes the trial justice's refusal to void the agreement because of a provision that would increase or reduce his obligation depending upon whether the cost-of-living index annually published by the United States Department of Labor indicated an upward or downward trend.

This controversy can best be put into focus by referring to the trial justice's comment as he denied the motion for a new trial, in which he stated:

> "There was an injustice done in this case. The injustice was that the jury should have returned a verdict for the plaintiff in the amount of seventy-five thousand dollars rather than forty-nine thousand dollars, and if there was error, it was error on the part of the Court in submitting to the jury the question of a credit for the deed of real estate that the defendant executed at a particular point in time. That may have confused the jury in this case, but that was an error against the plaintiff. * * * Although I am not satisfied with this jury verdict, the plaintiff has not made a motion for a new trial and, therefore, I cannot change that aspect of the verdict. I cannot grant an additur. The only motion before me is defendant's motion for a new trial and that motion borders on frivolous in this case. The defendant's motion is denied."

We are of the opinion that the trial justice's rejection of the newtrial motion was correct and his refusal to charge the jury on the defenses of "unconscionability" and "impossibility" was well warranted.

To put these defenses in perspective, we go back to the time Thomas testified. He conceded that he had fled the jurisdiction and traveled westward to Nevada. At that time he had failed to comply with a support order that Mary had obtained from the Family Court. Although Thomas did return to Rhode Island for a sojourn with his wife and two children, he had a girl friend in Las Vegas who was expecting him to return and marry her. In mid-December 1973 he deeded all his interest in the marital domicile and the vacant lot to Mary. Although he professed to be under pressure at this time, he did have the presence of mind to put his legal talents to work and add to the deed a printed disclaimer stating that the conveyance was being made subject to all encumbrances and restrictions of record, including any taxes due the town of Cumberland. Not quite four months later, in early May of 1974, Thomas signed the agreement he now challenges. A week after its execution, he returned to Las Vegas where he married his girl friend. He also contacted his Nevada counsel, with the result that the agreement was incorporated within the Nevada divorce decree.

In support of his unconscionability and impossibility claims, he now refers us to several cases, one of which is *Harrigan v. Harrigan*, 135 Vt. 249, 250, 373 A.2d 550, 552 (1977), where the court ruled that it would be justified in invalidating such agreements as the one now before us upon presentation of evidence of fraud, unconscionable advantage, impossibility of performance, or "hampering circumstances intervening beyond the expectation of the parties." The court in *Harrigan* was affirming the trial justice's refusal to recognize a property-settlement agreement. In doing so, it described the written agreement as very short and executed in a period of marital stress at a time when the wife had no attorney or opportunity to consult with one.

Long ago the United States Supreme Court in *Hume v. United States*, 132 U.S. 406, 411, 415, 10 S.Ct. 134, 136, 137, 33 L.Ed. 393, 396, 397 (1889), ruled that a court would usually refuse to enforce a contract on the ground of unconscionability only when the inequality of the bargain was so manifest as to shock the judgment

of a person of good sense and when the terms were so unreasonable that " 'no man in his senses and not under delusion, would make on the one hand, and as no honest and fair man would accept on the other' * * * ."

Here, unlike the wife in *Harrigan,* Thomas executed a multi-faceted document that was drawn with meticulous care—so much so that he could deduct alimony and support payments on his federal and state tax returns while Mary could claim the children as dependents on her return. Thomas, by no stretch of the imagination, was forced to accept its provisions. The fact that he caused the agreement to be incorporated into the Nevada decree certainly indicates that Thomas was of the belief that the agreement would serve his purposes. It was only when Mary sought to recover what was justly hers and her children's in August of 1977 that the agreement suddenly became unconscionable and impossible of performance.

 That a contract's performance becomes more difficult or expensive than originally anticipated does not justify setting it aside. *Taylor-Edwards Warehouse & Transfer Co., of Spokane, Inc. v. Burlington Northern, Inc.,* 715 F.2d 1330, 1336 (9th Cir.1983). The ultimate inquiry then for the purposes of accepting or rejecting a defense of impossibility is whether the intervening changes in circumstances were so unforeseeable that the risk of increased difficulty or expense should not be properly borne by Thomas. 6 Corbin, *Contracts* § 1322 at 330–31 (1962); 18 Williston, *Contracts* § 1963 at 180 (3d Ed. 1978).

 At trial it was obvious that Thomas, now the father of two children by the second marriage, was having difficulty supporting two families. The question then becomes whether this circumstance has made his ability to discharge his obligations under the 1974 agreement completely different from what should have been reasonably contemplated by the parties when they entered into the contract. The record

clearly indicates that Thomas was considering Nevada nuptials when he returned to Rhode Island. The agreement specifically took into consideration the possibility of Mary's remarriage, providing for the termination of alimony in case of such event. Likewise, we believe that Thomas should have foreseen that by remarrying he would once again become a father. Thus, he should have insisted on the inclusion in the agreement of a provision calling for a reconsideration of his contractual obligations as they relate to the area of the support of his first two children and their educational needs. Consequently, we affirm the trial justice's rejection of the defenses to which we have previously alluded.

At trial Thomas's counsel sought to void the cost-of-living proviso, relying upon *Mulry v. Mulry,* 95 R.I. 269, 271–72, 186 A.2d 576, 577 (1962), in which this court upheld a trial justice's refusal to consider an admitted increase in the cost of living and an insistence that the wife show that her needs had increased because of a change in circumstances since the entry of the decree then being challenged. Counsel at trial and before us continues to stress the holding in *Mulry,* notwithstanding that at the trial Mary made it perfectly clear that her calculations were based solely on what her financial records indicated and that she at no time was relying on the cost-of-living provision.

The final facet of Thomas's appeal relates to the alleged consideration offered him for his 1973 quitclaim deed. In the late 1970s Mary sold the marital domicile for $145,000. At trial Thomas had insisted that his quitclaim deed was the result of an agreement with Mary that he "was going to get credit for the amount of [his] interest in the property." Mary was just as emphatic as Thomas as she denied the existence of any agreement. The trial justice in his charge told the jury that if it was to find that in December 1973 Mary had agreed to give Thomas credit for his equity in the marital-domicile parcel, it was to value the property as of December 1973

and deduct from Thomas's interest "all the encumbrances and taxes and so forth."

■ Thomas now argues that his credit should have been valued on the basis of the $145,000 Mary received for the property. The simple response to such a contention is a reminder that when one seeks performance of an agreement such as described by Thomas, the party is bound to prove with some degree of certainty the terms of that agreement. At trial Thomas, when testifying in his own behalf, observed in direct examination that it was his "understanding" that Mary was to give him a credit for his interest in the marital domicile. However, in redirect examination, when asked by Thomas's trial counsel what Mary's response was when Thomas insisted that he was entitled to credit for his half interest, he answered, "She has always maintained that I was entitled to nothing."

■ Apart from the fact that, according to Thomas's own admission, Mary had never agreed to such a credit, the record indicates that the jury might have given a credit and determined its value as of December 1973. Although we are not privy to what actually happened in the jury room, it was clear that Mary in her testimony had established from her records that the deficiency owed on the May 1974 agreement was approximately $75,000. However, the only evidence about the value of the property in the early 1970s came from Thomas, who told the jury that the cost of building the marital domicile had been $60,000, that the lots had cost $10,000 each, and that this transaction had been financed by a bank loan of $50,000. Simple addition of the cost of the lots and the cost of the marital domicile produces a figure of $80,000 with an unpaid mortgage of $50,000, thus making the equity in the property $30,000. It is reasonable to assume that in returning a verdict for Mary for $45,000, the jury did in fact award Thomas a credit for his equity in what had been his marital domicile. Whatever the jury's method, we cannot fault the trial justice for his refusal to instruct the jury that the credit should be determined by the amount realized on Mary's subsequent sale of the so-called marital premises.

■ Turning now to Mary's appeal, Rhode Island's prejudgment-interest statute, G.L. 1956 (1985 Reenactment) § 9–21–10, calls for the imposition by the court clerk of interest at the rate of 12 percent per annum. Whenever a verdict is rendered or decision made for pecuniary damages, the interest is payable "from the date the cause of action accrued." The trial justice, in refusing to order the imposition of interest, remarked, "[T]here is no way that I can add interest to this figure because I have no way of knowing when the various components of this forty-nine thousand dollars were due and payable."

We subscribe to the sentiments expressed by the trial justice, pointing out that although the agreement called for payments to be made during a twelve-month period that would begin on May 1 of one year and end on April 30 of the following year, Mary's calculations were based on a calendar year rather than on the time frame spelled out in the agreement. The record is such that it is impossible to impose interest that would be in conformity with the statutory command that interest be payable from the date the cause of action accrued.

Both Mary's and Thomas's appeals are denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court.