# United States Court of Appeals
## For the First Circuit

No. 18-1422

SYLVESTER J. BRITTO, JR.,

Plaintiff, Appellant,

v.

PROSPECT CHARTERCARE SJHSRI, LLC; PROSPECT CHARTERCARE, LLC;
SANDRA NASTARI; ADDY KANE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Thompson, Circuit Judges.

Richard A. Sinapi, with whom Joshua D. Xavier and Sinapi Law
Associates, LTD. were on brief, for appellant.
Jillian S. Folger-Hartwell, with whom Alexsa A. Marino and
Littler Mendelson, P.C. were on brief, for appellees.

November 30, 2018

**THOMPSON**, <u>Circuit Judge</u>.  We are asked to referee yet another arbitration controversy "in which the parties are litigating whether or not they should be litigating."[1]  Rejecting Sylvester Britto's claims about the (supposed) unenforceability of the arbitration agreement before us, we affirm the district judge's order sending his case to arbitration.

### Setting the Stage

*Arbitration Agreement*

The key facts are undisputed and easily stated.  Britto is an African-American.  In March 1987, when he was 26, he began working as an at-will employee for St. Joseph Health Services of Rhode Island ("St. Joseph," to save keystrokes).  Decades later, in June 2014, Prospect Chartercare SJHSRI, LLC and Prospect Chartercare, LLC (collectively called "Prospect," following Britto's convention) acquired St. Joseph.[2]  During the transition, Prospect gave Britto an offer letter outlining the terms for his continued at-will employment.[3]  Among its many provisions, the

---

[1] <u>Anders v. Hometown Mortg. Servs., Inc.</u>, 346 F.3d 1024, 1026 (11th Cir. 2003).

[2] The record reflects various spellings of Prospect Chartercare SJHSRI, LLC and Prospect Chartercare, LLC.  We use the spelling employed in the companies' brief.

[3] Prospect says that Prospect Chartercare SJHSRI, LLC employed Britto, not Prospect Chartercare, LLC; Prospect Chartercare, LLC is Prospect Chartercare SJHSRI, LLC's parent company, apparently. But that detail does not matter for our purposes.

letter noted that Prospect could "change the terms of [his] employment, including compensation and benefits, at any time." The letter also instructed him, as a condition of his continued employment, to sign on a line in the letter below the words "ACCEPTED AND AGREED TO" — which would "acknowledge [his] acceptance of the above terms of employment" — and to sign two "additional documents" included with the letter, one of which was an arbitration agreement.

As relevant here, the arbitration agreement said that it was subject to the Federal Arbitration Act (the "FAA" from now on). And the agreement declared that "[t]o the fullest extent allowed by law, any controversy, claim or dispute between [Britto] and [Prospect] . . . relating to or arising out of [Britto's] employment or the cessation of that employment will be submitted to final and binding arbitration." Taking a belt-and-suspenders approach, the agreement added that it "cover[ed] all employment-related claims including, but not limited to, claims for . . . violation of public policy, discrimination, harassment, or any other employment-related claim under any state or federal statutes or laws relating to an employee's relationship with his/her employer." In its penultimate sentence, the arbitration agreement said:

> BY AGREEING TO THIS BINDING MUTUAL ARBITRATION PROVISION, BOTH YOU AND THE COMPANY GIVE UP ALL RIGHTS TO A TRIAL BY JURY.

And the agreement's last sentence proclaimed:

> BY SIGNING BELOW, I CONFIRM THAT I HAVE READ, UNDERSTAND AND AGREE TO THIS ARBITRATION AGREEMENT.

Prospect's employee handbook also emphasized that it "reserve[d] the right to revise, modify, delete or add to any and all policies, procedures, work rules or benefits stated in this [h]andbook or in any other document, except for the policy of at-will employment set forth herein." The handbook also mentioned arbitration, explaining that "[a]ll employees are required to sign an agreement to arbitrate their employment disputes as a condition of employment."

Complying with Prospect's instructions, Britto signed the pertinent papers at the end of a five-minute meeting with his supervisor.[4] The supervisor never asked him to read the documents, never discussed the significance of the arbitration agreement, and never said he could have an attorney look the documents over (Britto had no lawyer with him at the meeting, by the way). The

---

[4] Britto's brief talks a bit about the page numbers on these documents. "[T]he letter itself," he notes, is numbered "[p]ages 1 and 2." "[P]age 4 is the [a]rbitration [a]greement," he adds. Page 3 is not in the record, however, though he suggests that "'[p]age 3' may refer[]" to a code-of-conduct document also mentioned in the letter — a document he apparently signed too.

company's vice-president of human resources also signed the arbitration agreement.

*Lawsuit*

A few months later, in January 2015, Prospect fired Britto for (supposedly) violating the company's policies concerning workplace violence and harassment. He was 54 at the time. Prospect replaced him (allegedly) with a younger, non-African-American worker.

Not willing to take this turn of events lying down, Britto filed charges of age and race discrimination with the appropriate state and federal civil-rights commissions. And after getting right-to-sue letters from them, he filed this federal-court lawsuit against the defendants named in our caption, alleging that his discharge violated a mix of federal and state laws — specifically, the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.;* Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.;* the Rhode Island Fair Employment Practices Act, R.I. Gen Laws §§ 28-5-1, *et seq.;* and the Rhode Island Civil Rights Act, R.I. Gen. Laws §§ 42-112-1, *et seq.*

*Arbitration Fight*

Insisting that the arbitration agreement was valid and covered Britto's claims, the defendants invoked the FAA and moved to dismiss the complaint and compel arbitration. A mini paper

blizzard followed, principally on the issue of whether a valid agreement to arbitrate existed — an issue controlled by Rhode Island contract law, as all agree. See, e.g., Campbell v. Gen. Dynamics Gov't Sys. Corp., 407 F.3d 546, 552 (1st Cir. 2005) (explaining that "arbitration is a matter of contract, and for the most part, general principles of state contract law control the determination of whether a valid agreement to arbitrate exists") (citations omitted) (quoting AT&T Techs, Inc. v. Comm'cns Workers, 475 U.S. 643, 648 (1986)).

In his papers opposing the motion, Britto pressed two main points. First he argued that the defendants should be collaterally estopped from using the arbitration agreement, telling the judge that a different district judge in the same court — in a case called Conduragis v. Prospect CharterCare, LLC, No. CV 17-272-JJM-PAS, 2017 WL 5997417 (D.R.I. Dec. 1, 2017) — held the same arbitration agreement unenforceable for lack of consideration. Conduragis, Britto noted, deemed Prospect's promise to arbitrate illusory because the offer letter gave Prospect the right to tweak employment terms (of which arbitration was one) whenever it pleased. And, Britto added, Conduragis also deemed Prospect's offer of continued at-will employment illusory because Prospect could fire him at any time. Next Britto argued that even if collateral estoppel did not apply, the arbitration

- 6 -

agreement was still "unenforceable for lack of legal consideration" for the same reasons given in Conduragis. Plus, he wrote, the "procedural process" Prospect used to get him to sign the arbitration agreement made the agreement "unconscionable" and thus "unenforceable" as well.

The defendants responded that collateral estoppel was inapplicable because his case and Conduragis involved dissimilar issues and parties. The defendants also claimed that the arbitration agreement was a "separate, standalone" agreement, and so the offer letter's reservation of rights did not cover the arbitration agreement — which, according to the defendants, pulled the rug out from under Britto's illusory-promise theory premised on the letter's reserving Prospect's right to revise employment terms at will. But even if this were not so, the defendants asserted that the arbitration agreement was still enforceable because Britto's continued employment provided independent consideration for the agreement. And the defendants said that they saw no unconscionability problem, because nothing indicates either that Britto "lacked a meaningful choice or the requisite mental capacity" or that "the circumstances leading up to [his] signing" the arbitration agreement were "oppressive."

*Judge's Decision*

Ruling on the papers, the district judge held that a valid and enforceable arbitration agreement existed between the parties. In reaching this result, the judge first chose not to follow Conduragis. Unlike the Conduragis judge, the judge here concluded that the arbitration agreement was separate from the offer letter, meaning the letter's "reservation of rights [did] not cover the [a]greement" and thus Prospect's promise to arbitrate was not illusory. Also unlike the Conduragis judge — who relied on a Rhode Island superior court decision, D. Miguel & Son Co. v. Barbosa, No. C.A. 84-3186, 1985 WL 663146 (R.I. Super. Ct. Mar. 11, 1985) ("D. Miguel," for simplicity) — our judge relied on a Rhode Island Supreme Court case, Oken v. Nat'l Chain Co., 424 A.2d 234, 237 (R.I. 1981), in holding that Britto's agreement "to continue to work in exchange for [d]efendants' promise to continue to employ and compensate him for his services . . . [was] consideration sufficient to render the [a]greement enforceable." And having done so, the judge granted the defendant's motion to compel arbitration and dismissed Britto's suit without prejudice.

From this adverse ruling Britto appeals.

**Outlining the Standard of Review**

We review the judge's legal decision to compel arbitration with fresh eyes — *i.e.*, "*de novo*," to put it in

- 8 -

legalese. See, e.g., Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011). That means we can affirm his ruling on any ground supported by the record, even one he did not rely on. See id.; see also Lang v. Wal-Mart Stores East, L.P., 813 F.3d 447, 454 (1st Cir. 2016) (explaining what de novo review means).

**Summarizing the Arguments**

Britto attacks the district judge's ruling on multiple grounds. Rehashing the litany of arguments that the judge heard and rejected, he reminds us that the offer letter explicitly reserved to Prospect the right to change employment terms "at any time," a point "[r]einforced" in the employee handbook. And, he continues, because submitting certain disputes to arbitration was a required term of his employment, Prospect had the right to revamp the arbitration agreement at its pleasure. So reading the letter and the agreement together, he contends that this "escape hatch" — requiring him "to arbitrate" but "reserv[ing]" to Prospect "the right to rescind its promise to arbitrate" — made Prospect's arbitration promise "illusory," meaning Prospect's promise did not constitute sufficient "legal consideration for [his] promise to submit his claims to arbitration."

Britto also thinks illusoriness infects Prospect's promise in another way. Noting that the Rhode Island superior

- 9 -

court in D. Miguel said that "[c]ontinued employment alone is insufficient consideration," see 1985 WL 663146, at *2, he argues as well that Prospect's promise to continue an at-will-employment relationship did not suffice as legal consideration because (as the name suggests) at-will employment is terminable by either party at any time. Which, to quote from his brief, means even an "implied promise of continued at-will employment" is "illusory."

Then Britto turns to Conduragis. There, Britto says, a different district judge in the same court — dealing with the same offer letter and arbitration agreement for a different Prospect employee — held the agreement unenforceable for lack of consideration because of the (allegedly) illusory aspects of Prospect's promise. And he contends that our judge should have given collateral-estoppel effect to Conduragis or at least reached the same result as the Conduragis judge, after doing his own illusory-consideration analysis — though if we "believe[]" Rhode Island law is "unclear," he asks us to certify a question to the Rhode Island Supreme Court regarding whether a promise of at-will employment is "valid consideration."

Beyond these problems lies another, Britto asserts. In his mind, the judge should have held the arbitration agreement unenforceable as "procedurally unconscionable" given the surrounding circumstances — which, in his words, involved "a short

- 10 -

meeting, with no explanation, no time to review the documents, telling him it was mandatory to sign the documents, and presenting them as unimportant and routine."

Defending the judge's ruling, the defendants claim that Britto is wrong in every way. As they see it — and echoing what they said below — Prospect's promise to arbitrate is hardly illusory. That is because, by their lights anyway, the arbitration agreement was a stand-alone contract, since it required, for example, a separate signature. So, they continue, the judge rightly ruled that the offer letter's rights reservation did not cover the arbitration agreement, which, per the defendants, made the parties' mutual promises to arbitrate non-illusory. And, they stress, even if the judge botched this part of his analysis, he rightly deemed Prospect's continued-employment promise adequate consideration to support the arbitration agreement — a ruling, they stress, compelled by the Rhode Island Supreme Court's Oken opinion. Given all this, they think the judge faultlessly found Conduragis unpersuasive. And last, but not least, they also say that there was nothing unconscionable about the way they behaved.[5]

---

[5] For what it is worth, the parties implicitly agree that a court should decide the unconscionability issue vis-à-vis this arbitration agreement. And without saying whether either party could have argued for something different, we simply note that by not doing so, they waived any possible argument that they might have had. See United States v. Caramadre, 807 F.3d 359, 377 (1st

**Weighing in on the Case**

*Consideration*

Because arbitration is a creature of contract, see Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 67 (2010), parties to an arbitration agreement are generally free to agree among themselves on a host of things, like which claims to arbitrate and which law to apply (to name just two). Keeping "such agreements upon the same footing as other contracts" is the primary reason Congress passed the FAA. See Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 271 (1995) (quoting Volt Info. Scis., Inc. v. Bd. of Trs. Of Leland Stanford Univ., 489 U.S. 468, 474 (1989)). And thanks to the FAA, a party upset by another's unwillingness to arbitrate can ask a federal court to compel arbitration consistent with their agreement. See Volt Info. Scis., Inc., 489 U.S. at 474-75.

But to get anywhere, the asking party must show "that a valid agreement to arbitrate exists, that [he] is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope." Campbell, 407 F.3d at 552 (quoting InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003)). The dispute here is only over

Cir. 2015); Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011).

- 12 -

the first element — whether a valid arbitration agreement exists. Generally speaking, courts judge the existence (or not) of an agreement to arbitrate by normal state-law contract principles. Id. The parties, as we said, agree that this means Rhode Island law applies here. And we accept this sensible agreement. See Genereux v. Raytheon Co., 754 F.3d 51, 54 (1st Cir. 2014).

According to Rhode Island law, the essential elements of a validly-formed bilateral contract are "competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation." DeAngelis v. DeAngelis, 923 A.2d 1274, 1279 (R.I. 2007) (quoting R.I. Five v. Med. Assocs. of Bristol Cty., Inc., 668 A.2d 1250, 1253 (R.I. 1996)). Consideration may take the form of a "legal right acquired by the promisor in consideration of his promise, or forborne by the promisee in consideration of such promise." Id. (quoting Darcey v. Darcey, 71 A. 595, 597 (R.I. 1909)). In deciding whether adequate consideration existed to form a binding contract, Rhode Island uses "the bargained-for exchange test," which holds that "something is bargained for, and therefore constitutes consideration, 'if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.'" Id. (quoting Filippi v. Filippi, 818 A.2d 608, 624 (R.I. 2003)). Of course, if a promise is "illusory" — if the

- 13 -

promise makes performance optional with the promisor, for instance — then "a contract never came into existence." Centerville Builders, Inc. v. Wynne, 683 A.2d 1340, 1342 (R.I. 1996) (per curiam); see also JPL Livery Servs., Inc. v. R.I. Dep't of Admin., 88 A.3d 1134, 1143-44 (R.I. 2014); Vickers Antone v. Vickers, 610 A.2d 120, 123 (R.I. 1992).

With these principles in place, we turn to the task at hand.

The parties spend a lot of time debating whether the judge correctly rejected Britto's first multistep illusory-consideration claim, a claim (to repeat) that goes like this: (a) the offer letter's rights reservation — giving Prospect the unfettered discretion to change employment terms — covers the arbitration agreement, (b) making Prospect's arbitration promise illusory and thus (c) rendering the agreement unenforceable from the get-go for lack of consideration. Ultimately, though, we need not join the fray, because — even assuming (arguendo in Britto's favor) that one must read the offer letter and the arbitration agreement together — the judge properly ruled that Prospect's promise of continued employment provided sufficient independent consideration to make the agreement enforceable. See generally Stor/Gard, Inc. v. Strathmore Ins. Co., 717 F.3d 242, 248 (1st Cir. 2013) (noting that "[t]he simplest way to decide a case is

- 14 -

often the best" (quoting Chambers v. Bowersox, 157 F.3d 560, 564 n.4 (8th Cir. 1998))).

In this regard, we take our cue from the Rhode Island Supreme Court's opinion in Oken. There, an employee had an at-will employment contract with his employer, with his compensation tied to a commission-based system. See 424 A.2d at 237. At some point, the employer sent the employee a missive modifying the commission structure. Id. at 235. Later, after getting fired, the employee claimed that no consideration supported the modification. Id. at 237. And in a passage that directly supports our judge's ruling — and thus kiboshes Britto's argument to us — Rhode Island's highest court held that "[t]he continuation of [the employee's] employment *was* sufficient consideration to support" the modified employer-employee agreement. Id. (emphasis added).

Instead of addressing Oken — his briefs fail to cite, let alone attempt to distinguish, Oken — Britto faults the district judge for not following Conduragis, a decision by another district judge in the same district that read Rhode Island law as holding that continued employment was not adequate consideration. The big problem for him is that Conduragis relied not on Oken but on D. Miguel, a decision (we again note, as a matter of helpful repetition) by the Rhode Island trial court. See Conduragis, 2017 WL 5997417, at *3. Yes, D. Miguel did suggest that "[c]ontinued

- 15 -

employment alone is insufficient consideration" to support an employer-employee agreement because "it does not require an employer to change its existing position." See D. Miguel, 1985 WL 663146, at *2. But D. Miguel's suggestion is the *exact opposite* of what the Rhode Island Supreme Court held years earlier in Oken.[6] And when dealing with the law of a particular state, an on-point opinion by that state's highest appellate court outweighs one by that state's trial court (or for that matter one by another state's court) — a truism for which no citation of authority is needed. So we must follow Oken, not D. Miguel. Which is a key reason why, in another opinion released today, we reversed the Conduragis decision not to compel arbitration, see Conduragis v. Prospect Chartercare, LLC, ___ F.3d ___, ___ (1st Cir. 2018) [No. 18-1009, slip op. at 2-3] — an action that eliminates any need to consider the collateral-estoppel effect (if any) of Conduragis.[7]

As a fallback, Britto theorizes that a contract lacks sufficient consideration — and is therefore unenforceable — if one of a party's many promises is illusory, even if another promise is not. Applying his theory here, he says that because the offer letter gave Prospect the exclusive right to alter the arbitration

---

[6] For some unknown reason, the trial court in D. Miguel made no mention of the Supreme Court's Oken opinion.

[7] Britto's opening brief concedes that if "Conduragis is reversed," the collateral-estoppel doctrine does not apply here.

- 16 -

agreement, "Prospect's promise to arbitrate was illusory," making the agreement unenforceable — regardless of whether Prospect's offer of continued at-will employment was non-illusory and thus satisfactory consideration. But he cites no Rhode Island authority so holding (nor does he provide any persuasive explanation for why we should implement his vision of what he thinks the law should be). He does cite a couple of Rhode Island cases, but only for the uncontested proposition that an illusory promise foists no performance obligations on the promisor and gives no consideration to the promisee. See JPL Livery Servs., 88 A.3d at 1143-44; Centerville Builders, Inc., 683 A.2d at 1341. Ultimately, by raising his fallback argument "in skeletal form, without citation to any pertinent authority," he waived it. See Muñiz v. Rovira, 373 F.3d 1, 8 (1st Cir. 2004); accord Medina-Rivera v. MVM, Inc., 713 F.3d 132, 140-41 (1st Cir. 2013).

As a last-ditch effort on the consideration issue, Britto implies that maybe we should certify to the Rhode Island Supreme Court the question of "whether continued at-will employment is valid consideration." Oken obviates any need to certify, however. Also, Britto argues in his reply brief that because of Prospect's illusory arbitration promise, the arbitration agreement lacked not only consideration but also mutuality of agreement. We normally give no attention to arguments

- 17 -

débuted in a reply brief.  See, e.g., United States v. Torres, 162 F.3d 6, 11 (1st Cir. 1998).  And he gives us no reason to do otherwise here.

Having found his consideration-based claims unpersuasive, we next explain why Birtto's unconscionability-centered complaints cannot save the day for him.

*Unconscionability*

We start with a preliminary point.  In the jurisdictional section of his brief, Britto says that the judge "did not address" his "procedural unconscionability argument."  He says something similar in the brief's statement-of-the-case section.  But he does not brief any argument on this subject in the brief's argument section.  So he waived any argument that he might have had.  See, e.g., United States v. Parker, 872 F.3d 1, 10 n.6 (1st Cir. 2017); United States v. Trinidad–Acosta, 773 F.3d 298, 310 n.5 (1st Cir. 2014).

As for what Britto does argue — that the arbitration agreement is procedurally unconscionable — we note that under the FAA, courts analyze unconscionability "issue[s] under normal state law unconscionability standards."  See Skirchak v. Dynamics Research Corp., 508 F.3d 49, 59 (1st Cir. 2007).  And Rhode Island law says courts will typically "refuse to enforce a contract" on unconscionability grounds

> only when the inequality of the bargain was so manifest as to shock the judgment of a person of good sense and when the terms were so unreasonable that "no man in his senses and not under delusion, would make on the one hand, and as no honest and fair man would accept on the other."

Grady v. Grady, 504 A.2d 444, 446-47 (R.I. 1986) (quoting Hume v. United States, 132 U.S. 406, 411 (1889)).

We have read Grady as setting up a two-part test, requiring that the complaining party "prove that (1) there is an absence of meaningful choice on the part of one of the parties; *and* (2) the challenged contract terms are unreasonably favorable to the other party." E.H. Ashley & Co. v. Wells Fargo Alarm Servs., 907 F.2d 1274, 1278 (1st Cir. 1990) (emphasis added and internal quotation marks omitted). As Britto notes, some courts assign the labels of procedural unconscionability to requirement "(1)" and substantive unconscionability to requirement "(2)." He, for example, cites Baker v. Pawtucket Skilled Nursing & Rehab., LLC, No. PC 15-0181, 2016 WL 4410002 (R.I. Super. Ct. Aug. 16, 2016), which uses these labels. Anyway, and of particular pertinence here, E.H. Ashley & Co. interpreted Rhode Island law as holding that a contract is unenforceable if it is both procedurally and substantively unconscionable. We say that because E.H. Ashley & Co. ruled that regardless of whether the complaining party there could prove procedural unconscionability, its unconscionability

claim failed because it did not prove substantive unconscionability.  See 907 F.2d at 1278.

And that spells trouble for Britto.  After all, he pins his unconscionability hopes on persuading us that the "procedure" Prospect employed — *e.g.*, telling him to "immediately" sign key documents presented at the end of a five-minute meeting, without a lawyer present, and without explaining the papers' "significance" or seeing if he understood their terms — made the arbitration agreement *procedurally* unconscionable.[8]  But devastating to his unconscionability claim, he makes no attempt to carry his burden of showing that the agreement is substantively unconscionable — *i.e.*, he expends no effort to prove that the agreement's terms unreasonably favor Prospect.[9]  So, given E.H. Ashley & Co., his unconscionability claim fails.

---

[8] Pointing to two paragraphs in his affidavit, Britto's brief says (emphasis ours) that he "w[as] *prohibited* from taking the [a]rbitration [a]greement home to review it and/or to obtain the advice of an attorney."  But the first affidavit paragraph provides that "[t]here were no attorneys present during the [m]eeting to explain the pages within the [p]acket and/or the consequences of signing said pages."  And the second affidavit paragraph says that "[a]t no point . . . during the [m]eeting did . . . any[one] . . . state that I . . . w[as] permitted to take the [a]rbitration [a]greement home to review it and/or to obtain the advice of an attorney."  Fairly read, then, nothing in either paragraph supports the "prohibited" assertion in his brief.

[9] Britto relies heavily on Baker in asking that we find the contract unenforceable as unconscionable.  The Baker trial justice cited E.H. Ashley & Co. — requiring evidence of both procedural and substantive unconscionability to defeat a contract — but then

- 20 -

## Wrapping Up

Our work over, we affirm the judge's order dismissing the suit and compelling arbitration. Costs to appellees. <u>See</u> Fed. R. App. P. 39(a)(2).

---

refused to enforce the contract as unconscionable on the ground of procedural unconscionability alone. <u>See</u> 2016 WL 4410002, at *9-10 (finding procedural unconscionability when a person agreed to sign, without a clear explanation, a complicated legal document, while she was "heavily medicated" and mentally "vulnerable"). In so holding, the trial justice appears to have misapplied the <u>E.H. Ashley & Co.</u> standard. But absent a course correction from Rhode Island's highest court, we will continue to apply our previous interpretation of state law. <u>See</u> <u>Esquire, Inc.</u> v. <u>Esquire Slipper Mfg. Co.</u>, 243 F.2d 540, 544 (1st Cir. 1957).